94 Cal.Rptr.2d 359 (2000)
79 Cal.App.4th 899
Christine Lynette KUNS et al., Plaintiffs and Appellants,
v.
CITY OF URIAH, Defendant and Respondent.
Billy Mack Clark et al., Plaintiffs and Appellants,
v.
City of Ukiah, Defendant and Respondent.
No. A087470.
Court of Appeal, First District, Division One.
April 7, 2000.
As Modified on Denial of Rehearing May 4, 2000.
Review Denied July 19, 2000.[*]
*362 Johnson & DeMarchi, Thomas F. Johnson, Linda S. Mitlyng, Anacortes, WA, William B. Phillips, Healdsburg, Attorneys for Appellants/Plaintiffs Christine Kuns et al., Billy Mack Clark et al.
Shapiro, Galvin & Shapiro, Piasta & Moran, Joseph A. Piasta II, Adrienne M. Moran, Dana Beernink Simonds, Santa Rosa, Attorneys for Respondent/DefendantCity of Ukiah.
MARCHIANO, J.
This is an appeal from a summary judgment in favor of the City of Ukiah (the City) in a consolidated action arising out of a fatal residence fire which occurred after the City's utility company shut off the power to the residence of Christine and Emitte Kuns. We find that triable issues of material fact exist as to causation of the fire and reverse the judgment.

BACKGROUND
On December 26, 1995, the City of Ukiah's utilities department disconnected the power to the home that Christine Kuns shared with her husband, Emitte Kuns and six young children. Four of the children died of smoke inhalation in a fire that broke out that night, apparently started by a candle left unattended in a macramé plant hanger in the living room. On December 5, 1996, Billy Mack Clark, father of Ashley Clark, age 8, who survived the fire, and Brandon, age 4, Aaron, age 5 and Amy Clark, age 7, who did not survive the fire, filed a complaint for wrongful death and negligence against the City and the County of Mendocino.[1] The complaint was subsequently amended to add a cause of action for negligent infliction of emotional distress.[2] Christine Kuns filed a complaint against the City, subsequently amended to allege wrongful death, negligence and negligent infliction of emotional distress.[3] The complaints were consolidated pursuant to stipulation of the parties on July 16, 1997.
On August 13, 1998, the City filed a motion for summary judgment in the consolidated case. In addition to various arguments regarding claims against other departments of the City which are not before us, the City's motion was based on the contention that Public Utilities Code sections 10010 and 10010.1 did not create a duty of care owed to appellants and that appellants could not establish that any act or omission of the City proximately caused the fire.
The following facts were submitted to the court for purposes of the motion for summary judgment. The City billed Christine and Emitte Kuns $177.68 for utilities on October 27, 1995. They failed to make any payment on the October bill, and the utility records showed that a delinquency notice was sent on December 4, 1995. Christine denied ever receiving the December 4 notice and the City did not retain a copy of the notice. Erin Tarkhanian, the City's customer service representative, stated that the December 4 notice stated a "pay by" date and warned that if payment was not made, a 48-hour notice would issue and penalties would be assessed. The form of notice produced by the City did not mention disconnection of service.[4]
*363 Another notice was sent on December 14, 1995, which stated: "current charges: $200.01, past due charges $177.68, late fee $5.00, total due $382.69, pay by 12/21/95."[5] The notice was headed "final notice" and provided that the account was past due and unless payment in full was made by the "pay by" date, the power would be disconnected.[6] Christine received this notice. She believed that there was an amount due, but expected she would receive a 48-hour notice prior to any disconnection. Utility records showed that Christine had been behind in payments to respondent on many occasions, but had contacted the City and eventually paid.
On this occasion, the City made no attempt to give either a 24 or a 48-hour notice of disconnection. Christine was home at all times because of her new baby, and did not receive any additional notice. The statutory period required by section 10010.1 would have allowed the City, with proper notice, to disconnect the power 15 days from the date of the notice, on December 29. Christine stated that if she had received a 48 or 24-hour notice she would have found a way to pay the bill before the 29th. In addition, Emitte had enough cash on the 26th to cover the past due portion of the bill.
On December 26, 1995, the day after Christmas, the City disconnected the utilities. Christine, Emitte, and Christine's stepfather, Mr. Whitcombe, called the City that day to attempt to get the power reconnected. Christine Kuns had $200 on deposit with the City's utilities department. Whitcombe requested that the City turn the power on that day, and promised to pay in seven days. Emitte offered $250 or $300 cash, which would have covered the past due amount, but was told that he had to pay the entire amount, including disconnect fees, before the power would be turned on. The City did not offer to apply the deposit toward payment of the account.
City personnel stated that if Emitte had spoken with the City prior to the power being disconnected, the City would have accepted his payment, which would have covered the past due amounts. Private and state funded assistance programs were no longer available because the power had already been turned off. Emitte and Christine were not offered information about or offered an opportunity to amortize the past due payment at this time.[7] *364 They were told that they would have to pay the entire past due amount, current amounts due, disconnect and reconnect fees, before the power would be turned on. The total due was $417.69.
Unable to negotiate a reconnection of the power with the City, Christine and Emitte borrowed candles from their neighbor to light the house that night. Christine put one candle in a jar in the living room and one on a dish in the kitchen. Emitte put the third candle in the soil of a plant hanging in a macrame plant hanger above the couch. After Christine and the six children went to bed, Emitte left the house. He left the candle in the potted plant in the plant hanger unattended. That candle apparently ignited a fast burning fire which, combined with the foamcushioned couch, Christmas tree and gift wrappings, quickly produced high temperatures, large quantities of smoke, heat and toxic gases.
Christine, who took phenobarbital for her epilepsy, did not awaken until Ashley came into her bedroom and tugged on her arm saying that her throat hurt. Christine saw an orange glow in the hallway and panicked. She ran down the hallway, past the bedrooms where the other children were sleeping, and saw the couch in the living room in flames. She could smell smoke, but did not see any smoke in the house. She ran to the neighbor's house for help, then returned and grabbed two of her children. The other four children died in the fire.
The court granted the City's motion for summary judgment. Judgment was entered on April 21, 1999, and Christine Kuns and Billy Mack Clark appealed.[8]

DISCUSSION
A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o)(2).) "[T]he burden [then] shifts to the plaintiff ... to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2).) The sole function of the trial court is to find issues, not to resolve them. (Saldana v. Globe-Weis Systems Co. (1991) 233 Cal.App.3d 1505, 1511, 285 Cal.Rptr. 385.) The trial court's ruling on a summary judgment motion is subject to de novo review. (Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 674-675, 25 Cal.Rptr.2d 137, 863 P.2d 207.)
Oral argument on the motion for summary judgment in this case as well as the court's written statement of decision, focused on the existence of a duty on the part of the City as well as proximate cause. However, the order granting summary judgment mentioned duty only in a footnote in which the court stated that it rejected the City's argument that Public Utilities Code sections 10010 and 10010.1 do not create a duty of care.
The court's judgment was based, not on the issue of duty, but on its determination that appellants could not establish causation as a matter of law. Specifically, the court stated: "Spoiled refrigerated food is damage which can be easily and directly linked to a loss of electrical power." In contrast, the court found: "Destructive fires result from negligent use of open flames and such devices regardless of whether or not the electrical power to a residence is connected or even exists." In addition, the court relied on the doctrine of judicial estoppel to support its decision. This determination was based on statements No issue is raised on appeal as to this portion of the statements. *365 made by Christine and Billy Mack Clark in child custody proceedings to the effect that Emitte's actions caused the fire. Because both of the court's conclusions are erroneous, we reverse the judgment.[9]
The failure to give the statutorily required notice and the termination of the power were not the physical causes of the fire. But the law does not look to Newton's laws of motion to explain cause and effect, but to its own definition of "substantial factor" in determining legal cause. The question is whether the premature cutting off of the power is a legally causative factor. As explained below, whether the City's conduct or the later intervening actions of Emitte Kuns or others constituted sole or joint substantial factors in causing the damages is the type of question about which reasonable men and women can differ  a dispute of contested factual issues properly allocated to and resolved by the fact-finding capability of a jury. (Braman v. State of California (1994) 28 Cal.App.4th 344, 355-356, 33 Cal.Rptr.2d 608.) Whether the intervention of a later cause is an interconnected risk of the City's conduct so that responsibility should not be terminated, or is such that ordinary human experience should anticipate it, is the type of traditional proximate cause normally determined by the hindsight of jurors. (See generally Prosser & Keeton, Torts (5th ed.1984) ch. 7, §§ 41-5, pp. 263-321.)

Whether the City's Acts Were a Substantial Factor in Causing Appellants' Injury is a Jury Question
The City correctly frames the issue: would the fire have occurred even if the City complied with the notice requirements and did not disconnect the electricity until December 29? We disagree with the City's analysis of the issue. Specifically, the City argues that the harm indisputably would have occurred even if the disconnection had been properly noticed because Christine and Emitte Kuns could not have paid on December 29, and would have used candles regardless of when the power was disconnected.
This issue, in light of the evidence produced to date, is a factual question for the jury. The City failed to produce undisputed evidence that Christine Kuns would not have paid the past due amounts if she had received a 48 or 24-hour notice of disconnection.[10] There was no evidence that Kuns could not have raised the money if she had been given proper notice and allowed the statutory time in which to avoid disconnection and the need to use candles for light in the darkness of their residence. In addition, appellants presented evidence that the family would not have been using *366 candles it the electricity had not been abruptly terminated.
The determination of causation rests on a jury's common sense analysis of the facts based on ordinary experience guided by applicable legal principles. The appellant's burden of proof to establish causation is explained in the Restatement Second of Torts: "It is enough that [plaintiff] introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists." (Rest.2d Torts, § 433B, com. b, p. 443.)
The City's conduct may be said to be a cause of appellants' harm if the acts of the City were a substantial factor in bringing about the harm. (Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1049, 1 Cal.Rptr.2d 913, 819 P.2d 872; Rest.2d Torts § 431.) Causation is generally a question of fact for the jury. (Hoyem v. Manhattan Beach City Sch. Dist. (1978) 22 Cal.3d 508, 520, 150 Cal.Rptr. 1, 585 P.2d 851.) ""`Legal cause' exists if the actor's conduct is a `substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability. [Citations.]" ... The question of causation is one of fact; it becomes a question of law only where reasonable people do not dispute the absence of causation. [Citation.] It is also a question of fact when the issue is whether the defendant's negligence was a substantial factor in causing injuries inflicted during a criminal attack by a third party. [Citation.] The defendant has the burden of establishing there was not `"room for a reasonable difference of opinion"' on the issue of causation. [Citation.]" (Rosh v. Cave Imaging Systems, Inc. (1994) 26 Cal.App.4th 1225, 1235, 32 Cal.Rptr.2d 136.) "The standard is high for finding as a matter of law that the material facts show a lack of causality...." (Constance B. v. State of California (1986) 178 Cal.App.3d 200, 207, 223 Cal.Rptr. 645.) Whether an act is the cause of an injury is a question of law only when "the facts are uncontroverted and only one deduction or inference may reasonably be drawn therefrom." (Sanders v. Atchison, Topeka & Santa Fe Ry. Co. (1977) 65 Cal.App.3d 630, 649, 135 Cal. Rptr. 555.)
The City relies on Tovar v. Southern Cal. Edison Co. (1988) 201 Cal.App.3d 606, 247 Cal.Rptr. 281 and Capolungo v. Bondi (1986) 179 Cal.App.3d 346, 224 Cal.Rptr. 326 to argue that causation is absent in this case. Those cases are not similar to the facts at issue. Tovar involved a suit by the residents of a motel against a utility and the owners of the motel. The applicable statute required 10 days notice of intent to terminate utility services when the master account was in arrears. On November 14, the utility left a notice that services would be terminated on November 18 due to arrearages in the master customer's account. (Tovar v. Southern Cal. Edison Co., supra, 201 Cal.App.3d at p. 611, 247 Cal.Rptr. 281.) However, the utility actually terminated service on November 15, pursuant to the direction of the landlord. (Id. at p. 610, 247 Cal.Rptr. 281.) The tenants claimed that the termination notice did not comply with the statutory notice requirements applicable when the account is in arrearages. The court concluded that regardless of the acts of the utility, the cause of the termination was the order by the landlord, not the improper notice based on arrearages in the master account. (Id. at p. 610, 247 Cal.Rptr. 281.) Unlike this case, Tovar is a case where the act of the landlord caused the plaintiffs harm independently of any action by the power company. The landlord in Tovar solely and directly caused the termination of service.
*367 In Capolungo, the plaintiff was injured when she swerved her bicycle around defendant's parked car and was hit by a passing motorist. Plaintiff argued that defendant was negligent per se because he had parked in a yellow zone for longer than the 24-minute limit. (Capolungo v. Bondi, supra, 179 Cal.App.3d at p. 349, 224 Cal.Rptr. 326.) The court found that regardless of whether defendant's car had been parked for more or less than 24 minutes, plaintiff would have swerved around it and been injured. The element of legal causation was missing because the accident would have happened even if the car had been parked for the legal time limit. (Id. at p. 355, 224 Cal.Rptr. 326.) Like Tovar, Capolungo is a case in which the independent act of a third party, which was unrelated to the original actor's negligence, caused the plaintiffs harm.
In Tovar and Capolungo, the facts demonstrated that the plaintiffs would have been injured by an independent cause even if the proper notice had been given and the parking time limit had been observed. Here, in contrast, the City ignores the specific and unusual facts that appellants produced in opposition to the summary judgment motion. In particular, appellants produced evidence that with proper notice, Christine would have paid the delinquent bill and the resort to alternative sources of light would have been unnecessary. Appellants' argument in this case is that the cause that injured them was directly dependent on and related to the improper notice itself.
The City argues that appellants never proved that Christine could have paid the bill in full even if the City had given the 24 or 48-hour notice and waited the appropriate three additional days to disconnect the power. However, it is not appellants' burden to affirmatively prove every element of the case in order to resist a summary judgment. In Christine's initial contract with the utility, she noted she was receiving Aid to families with Dependent Children (AFDC), which provided some notice to the City of her financial circumstances. The City's records showed many times that Christine had requested and received extensions of time, and had finally paid the amounts due. The undisputed evidence indicates that Christine and Emitte Kuns were habitually late in paying their utility bills, but had managed to avoid disconnection by paying at the last minute.
Christine testified that if she'd been given a 48-hour notice in December of 1995, she would have again found a way to pay the bill to avoid disconnection of the utilities. When she received the December 14 notice, she believed she had to pay by the stated date or she would get a 48-hour notice of disconnection. In the past, when she received the 48 or 24-hour notice, she testified that she would call "everybody and their mama" to get the money. Billy Mack Clark had helped with money in the past, as had her mother and an energy program. Patricia Archibald, supervisor of the City's utility department, stated that Emitte called her on December 26 after the power was shut off, said "Come on, I've got little kids here," and offered to bring in $250, which was more than the delinquent amount from October, if the power could be reconnected.[11] Archibald refused. Archibald and Tarkhanian admitted, however, that if Emitte had offered to pay the delinquency before the power was physically shut off, alternatives would have been available and the City would have worked out payment arrangements. The power should not have been shut off at that time because the statutory 15 days before termination had not elapsed. In fact, Christine and Emitte were trying to make arrangements to pay the delinquency at a time when the power should have been on.
Contrary to the City's position, appellants offered evidence that they would have paid at least the overdue portion of the bill, and possibly the entire bill if they *368 had been properly noticed and given the statutory time limit in which to pay. In order to prove that its action was not a substantial factor in causing the harm, it was the City's burden on summary judgment to produce undisputed evidence that Christine and Emitte could not have paid with proper notice. The City has not directed us to evidence in the record on appeal where Christine Kuns or anyone intervening on the family's behalf stated that they could not have paid the bill by the correct termination date of December 29 if allowed the proper time to do so.[12] The electric power should have been on during three days in which appellants could have sought assistance to pay the bill. In fact, Patricia Archibald stated that the fact that the power had already been turned off made assistance from H.E.A.P. (Home Energy Assistance Program) or R.E.A.C.H. (Residential Energy Assistance Challenge) inaccessible to the Kuns family.[13]
In support of its argument that the use of candles was inevitable, the City notes the declaration of appellants' fire expert, stating that it is common knowledge that people use candles when the electricity is off. Frank Holbrook, appellants' fire expert, also stated that Christmas holidays are a dangerous time for fires due to extremely flammable Christmas trees and wrappings being present in homes. Other evidence submitted to the trial court indicated that use of candles and resulting fires are common occurrences when the power is off. Appellants also submitted a table of statistics showing 429 residential fires caused by candles in 1993, and similar numbers for the previous 19 years. The City's Fire Deputy Chief, Roe Sandelin, testified at his deposition that he had seen five or ten fires start from candles burning. He also stated that he had seen fires that occurred after the electricity had been turned off in a residence.
The City argues that these facts prove the fire would have happened regardless of when or how the power was disconnected. However, the facts also support the inference that the use of candles in this case was a foreseeable, direct and potentially dangerous response to the City's lack of proper notice and abrupt termination of the electricity. The City's argument on this point assumes that disconnection of the power was inevitable, which is a disputed fact at this stage of the proceedings.
The trial court erred when it concluded that causation was negated by the facts that "candles are used year round" and that open flames at Christmas can cause fires even if the electricity is connected. These general factual statements resolve no issue in this case. There is no evidence that appellants routinely used candles prior to the disconnection. To the contrary, the undisputed evidence submitted by appellants was that they had to borrow three candles from the neighbor after the power had been disconnected. The City failed to provide undisputed evidence to support its argument that the fire in this case would have happened even if the City had complied with the notice provisions of the Public Utilities Code.
The evidence presented at this stage of the case leaves room for a reasonable difference *369 of opinion. Whether the action of the City in this case was a substantial factor in causing the harm to appellants remains a question of fact to be resolved by the appropriate fact finder at trial, not by summary judgment.

An Intervening Cause Does Not Negate Liability
Although the main focus of the City's argument is the substantial factor issue, the reliance on the intervening cause cases of Tovar and Capolungo indicates that the fundamental issue in this appeal is the effect of the actions of Emitte Kuns on the City's liability. The City argued in the trial court that Emitte's acts of leaving a burning candle unattended and removing the battery from the smoke alarm preclude any liability on the part of the City. Appellants concede that this is a case in which more than one action contributed to the harm, but argue that Emitte's actions do not relieve the City of liability as a matter of law.
The law in California is that foreseeable intervening acts do not immunize the initial actor from liability. (Richardson v. Ham (1955) 44 Cal.2d 772, 777, 285 P.2d 269; Mosley v. Arden Farms Co. (1945) 26 Cal.2d 213, 218, 157 P.2d 372.)[14] "Causation in the law of negligence is not determined by a linear projection from a `but for' premise. Instead, it is expressed in terms of `foreseeability' and is limited by the policy that cause must be `proximate.' The problem is complex, and has bedeviled many. [Citations.]" (Brewer v. Teano (1995) 40 Cal.App.4th 1024, 1030, 47 Cal.Rptr.2d 348.) As the court in Brewer noted, the Restatement Second of Torts sets out the rules for evaluating the issue of whether the acts of another party intervene in the chain of causation in such a manner as to prevent the original actor from being liable for harm to another.[15] (40 Cal.App.4th at p. 1031, 47 Cal.Rptr.2d 348.)
"An intervening force is one which actively operates in producing harm *370 to another alter the actor's negligent act or omission has been committed." (Rest.2d Torts, § 441, subd. (1).) "Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause." (Rest.2d Torts, § 442A.) As stated by Witkin: "Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 975, p. 366.)
Negligence alone does not make a third party's intervention a superseding cause. (Rest.2d Torts, § 447.) If the intervening act "... is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent" a third party's negligent act does not supersede the liability of the initial actor. (Rest.2d Torts, § 447, subd. (c).) Even intervening criminal conduct may not be a superceding cause, thereby breaking the chain of causation.[16] "... It is settled, however, that `If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' [Citations.]" (Richardson v. Ham, supra, 44 Cal.2d at p. 777, 285 P.2d 269 [citing Rest.2d Torts, § 449].) (Italics added.)
In effect, the trial court in this case accepted the City's argument that Emitte's action in leaving a burning candle unattended was a superseding cause which relieved the City of liability as a matter of law. However, the evidence produced in opposition to the summary judgment motion showed that it was very likely that cutting off the power without giving the resident the statutory 24-hour personal or 48-hour mailed notice, would, and did, result in the unprepared resident being unable to pay the amount in arrears and thereby prevent disconnection. The evidence produced in connection with the summary judgment motion indicated that the City would have accepted Emitte's payment of the past due amounts if he had offered it prior to disconnection of the power. Christine's testimony indicated that she would have produced payment if she had known the disconnection was imminent. The lack of proper notice resulted in the abrupt disconnection, which triggered a foreseeable attempt to compensate for loss of the electricity. The court erred in finding as a matter of law that leaving a candle unattended was a superseding cause of the harm. (See, e.g., Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 58-59, 192 Cal.Rptr. 857, 665 P.2d 947.) To reach a "Palsgrafian" result in the context of the disputed facts in this case would improperly withdraw causation from the jury guided by BAJI No. 3.79.[17]
*371 The City also contended that an additional superseding cause of the deaths of the children was the fact that the smoke detector was not working. The City asserted in support of its motion that Emitte had removed the battery from the smoke detector. The City hinted at possible criminal activity on Emitte's part. Christine testified that the battery might have been dead, as she heard it "chirp" about a week before the fire, but could not remember if anyone replaced it. Emitte was not sure if the battery had been taken out the last time the oven smoked or not. He did not know whether the smoke detector worked on the night of the fire. The evidence on this point was equivocal. However, even if it is accepted that Emitte removed the battery at some time in the past, there was evidence that the smoke detector was connected to the electric system of the house as well as having a battery. This possibility implicates the City's action in abruptly terminating the power as well as any act of Emitte in rendering the smoke detector inoperable.
In addition, Ashley in fact managed to arouse her mother while the fire was still confined to the couch in the living room. Christine arose and went down the hall and saw only the couch in flames. She was awake and active before the fire progressed to the bedroom area of the house, which makes the lack of a smoke detector a less important causal factor at this stage of the case. In any event, the facts regarding the smoke detector do not establish a superseding cause for purposes of summary judgment.
The question of whether the acts of Emitte Kuns were foreseeable is for the jury unless the undisputed facts allow only one conclusion. (Jackson v. Ryder Truck Rental, Inc. (1993) 16 Cal.App.4th 1830, 1849, 20 Cal.Rptr.2d 913.) In summary, a jury should determine to what extent, if any, the insufficient notice and the act of shutting off the power on December 26 deprived the Kuns of three days within which to pay their bill, led to the use of candles, and caused their damages; whether the Kuns could have paid the arrearage between December 26 and December 29 or would the same result have occurred on the 29th; or whether the actions of Emitte Kuns and others were foreseeable or superceding acts relieving other negligent persons of responsibility. The facts surrounding causation of this tragic fire are disputed, and subject to differing inferences.[18] It was error to grant summary judgment on the issue of causation.

Judicial Estoppel is Not Applicable
The court stated an additional reason in support of its order granting summary judgment. This alternative reason was based on the court's determination that several statements made in other actions judicially estopped appellants from claiming that the City was responsible for the fire.
*372 Referring to Christine Kuns' application for a restraining order against Emitte in February of 1997, the court noted the following statement in Christine's supporting declaration.
"On December 26, 1995, my six kids and I went to sleep for the night. We had a candle burning in the living room for light. We left Emitte on the couch just below the burning candle. He left my house, got stoned and went to a casino leaving the candle burning which started the fire. Me and two of my children escaped. Four died."
Referring to the declaration of Christine's mother, Carol Whitcombe, submitted by Billy Mack Clark in his action requesting custody of Ashley, the court quoted as follows:
"I know for a fact the following is true: Emitte Kuns has an extreme gambling problem, and would deliberately get into fights with Christy in order to leave the house to go gambling at the local casino.
"On December 26 in the morning hours I received a call from my daughter Christy who stated to me that Emitte had, for the second time, tried to suffocate her and told her that he would be the one to take her life.
"On December 27, 1997, Emitte Kuns told me that prior to the fire he had removed the batteries from the smoke detectors in the home because `they went off when they were cooking.'"
The doctrine of judicial estoppel "`applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted.'..." (International Engine Parts, Inc. v. Feddersen & Co. (1998) 64 Cal.App.4th 345, 350, 75 Cal.Rptr.2d 178.) "Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." (Ibid., [internal quotation marks and citations omitted].) The doctrine applies when the same party takes inconsistent positions in a judicial or quasi-judicial proceeding. The party must be successful in asserting the first position, in that the tribunal accepts the position as true. (Id. at p. 351, 75 Cal.Rptr.2d 178.)
International Engine Parts, Inc. v. Feddersen & Co., supra, 64 Cal.App.4th 345, 75 Cal.Rptr.2d 178, relied on by the trial court, presents a clear example of judicial estoppel. In that case, the prior proceeding was a bankruptcy case, which imposes a duty to disclose to creditors all property rights of the debtor. The possibility of any nonbankruptcy litigation is one of the items subject to mandatory disclosure. In the bankruptcy action, appellants successfully argued that their former chief financial officer was responsible for the company's accounting problems. (Id. at p. 348, 75 Cal.Rptr.2d 178.) Although the evidence was clear that the debtor had knowledge of a potential action against the defendant accounting firm for accounting malpractice, the debtor intentionally did not disclose this action in the bankruptcy case. (Id. at pp. 348, 351-352, 75 Cal.Rptr.2d 178.) After the debtor obtained the relief sought from the bankruptcy court, including the rejection of an executory contract with the chief financial officer, it commenced an action for damages for accounting malpractice against the defendant. (Id. at p. 349, 75 Cal. Rptr.2d 178.) The court correctly applied judicial estoppel to prevent the debtor from taking the inconsistent position that the accounting firm was responsible for the plaintiffs accounting problems. "The purpose [of judicial estoppel] is to protect the integrity of the judicial process and not the parties of the lawsuit." (Id. at p. 350, 75 Cal.Rptr.2d 178.)
In this case, the positions taken in the child custody and restraining order cases do not directly contradict any position taken in this action against the City. The second amended complaint admits that Emitte used the candle to provide light in response to the City's improper *373 disconnection 01 the electricity and that the candle "inadvertently" set the fire. There is nothing inconsistent between this position and the statement that Emitte left the candle burning when he left the house that night. There is no equitable reason to invoke judicial estoppel.[19]
The declaration of Carol Whitcombe in Billy Mack Clark's custody case regarding a threat and taking the battery out of the smoke detector is not inconsistent with any position taken in this case. As noted previously, the issue of the batteries in the smoke detector has little importance in the resolution of the legal issue in the case in its present posture. Lack of electricity was also at fault for its malfunction, if it is eventually proved that it did not function. Further, since Ashley actually roused Christine Kuns before the fire spread to the back of the house, the fact finder could determine that the smoke detector was not a contributing factor. In addition to the lack of inconsistency in the statements referred to by the trial court, there is no evidence that any court accepted the statements as true in rendering a decision. The doctrine of judicial estoppel is not applicable in this case.

Evidentiary Issues
Appellants argue that the trial court erred in admitting various deposition transcripts during the hearing on the summary judgment motion. Appellants particularly identify the deposition of Marcia Stroud Clark, appellant Billy Mack Clark's wife. This deposition involved factual statements that were disputed by Billy Mack Clark. Furthermore, it does not appear that the court relied upon the statements in ruling on the summary judgment motion. The court allowed counsel to lodge the deposition with the court during argument, but apparently did not rely on it. It is not clear that any of the questioned depositions were either admitted as evidence or considered by the court.
Appellants also object to the court's refusal to rule separately on each objection to the City's evidence. The court stated that it agreed with the City's analysis of the evidentiary issues and overruled appellants' objections. Appellants do not specify which objections were wrongfully overruled, nor do they state any legal reasoning which would support the sustaining of any of the objections. In addition, the court offered appellants two opportunities to file specific objections to its rulings, and appellants failed to make their objections clear at those times. We conclude that appellants failed to preserve the issue for appeal. In addition, the evidence referred to by appellants apparently had no bearing on the decision granting summary judgment.

DISPOSITION
It was error to grant summary judgment on the issue of causation. Based solely on the undisputed evidence submitted in support of the motion, appellants have raised triable issues of material fact regarding causation. The judgment is reversed and the matter is remanded for further proceedings. Appellants are entitled to costs on appeal.
STRANKMAN, P.J., and SWAGER, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] The fourth child who died was Casey Kuns, age 1, one of the two children of Emitte and Christine Kuns.
[2] The cause of action against the county for negligent infliction of emotional distress was voluntarily dismissed on June 17, 1997.
[3] Plaintiffs in Christine's action included Ashley Clark, age 8 and Deanna Kuns, age 2 months at the time of the fire. Emitte is not a party in either action.
[4] City records showed the notice had been sent, but Christine Kuns claimed she never saw the notice, and the utility did not have a copy of the form of notice sent. Customer service representative Erin Tarkhanian stated that a computer notation indicated that a notice was sent on December 4. There was some confusion as to which form of notice was sent and the content of the notice. A form of notice was attached to one of the declarations submitted in support of the summary judgment motion. The City has not produced a form that references disconnection on the December 4 notice.
[5] December 21 was seven days after the December 14 mailing of the notice. Prior to the 1985 amendments, Public Utilities Code section 10010 required only a seven-day notice of termination for nonpayment of a delinquent account. (See Historical and Statutory Notes, 58 West's Ann. Pub. Util.Code (1984 ed.) foll. § 10010, p. 186.) At the relevant times in this case, section 10010 provided for a 10-day notice of termination plus 5 days for mailing. Fifteen days after the December 14 notice would have been December 29.
[6] Until August of 1995, the City used a notice titled: "Final/48-hour Notice." After August, the 48-hour wording was deleted. The notice did not contain any information about the procedure for requesting an extension or amortization.
[7] Section 10010.1, subdivision (d)(5) requires every notice of termination to include information regarding "[t]he procedure by which the customer may request amortization of the unpaid charges." Section 10010, subdivision (e) provides that any customer who obtains the certification of a physician that termination of service will be life threatening and the customer is financially unable to pay "... shall, upon request, be permitted to amortize, over a period not to exceed 12 months, the unpaid balance of any bill asserted to be beyond the means of the customer...." Deposition testimony indicated that Emitte suffered from attention-deficit disorder, obsessive-compulsive disorder, Tourette's syndrome and fetal alcohol syndrome. Neither Christine nor Emitte had ever told the City about the existence of their disabilities.
[8] The trial court dismissed the action as to the City's fire, police and ambulance departments
[9] Appellants argue that the trial court erred by not specifically adjudicating the issue of duty. As respondent points out, to the extent this issue was addressed, the court's comment was favorable to appellants. Respondent has not cross-appealed or urged us to review the subject of duty. We conclude that the question of duty is not currently before us and express no view on that issue.
[10] Public Utilities Code section 10010 provides that a municipally owned electric utility may not "terminate residential service for nonpayment of a delinquent account unless the public utility first gives notice of the delinquency and impending termination, as provided in Section 10010.1" (Pub.Util.Code, § 10010.) Section 10010.1 contains specific and detailed provisions, which prohibit termination of electric service for nonpayment unless the utility gives notice of the proposed termination 10 days prior to the termination. The notice may not be mailed earlier than 19 days from the date of mailing of the bill. The 10-day period does not begin to run until 5 days after the notice is mailed, effectively giving 15 days after the notice to pay the past due amount. (§ 10010.1, subd. (a).) Furthermore, the statute requires the utility to "make a reasonable attempt to contact an adult person residing at the premises of the customer by telephone or personal contact, at least 24 hours prior to any termination...." (§ 10010.1, subd. (b).) If personal contact cannot be accomplished, "the public utility shall give, by mail, in person, or by posting in a conspicuous location at the premises, a notice of termination of service, at least 48 hours prior to termination." (§ 10010.1, subd. (b).)
[11] Archibald had not begun working for the City until December 18, just before the fire. She had received no instruction on the legal procedures for terminating electric services.
[12] The City's separate statement of undisputed facts in support of its motion for summary judgment did not even assert the fact that appellants would have been unable to pay if the power had remained connected for the appropriate time period. Undisputed statement number 32 in the City's statement merely represents that Emitte Kuns stated that he had $250 or $300 to apply to the account, "at no time before the fire did he bring that money in to the utility department."
[13] Tarkhanian described the R.E.A.C.H. program, funded by the Salvation Army, as a financial assistance program the City referred utility customers to for help in paying overdue utility bills. The H.E.A.P. program was a similar state funded financial assistance program for low income families.
[14] Courts in other states have reached conflicting results in cases involving injuries sustained as a result of a plaintiff's attempt to compensate for a landlord's wrongful termination of hot water or heat. (Annot., Landlord and Tenant: Violation of Statute or Ordinance Requiring Landlord to Furnish Specified Facilities or Services as Ground of Liability for Injury Resulting from Tenant's Attempt to Deal with Deficiency (1988) 63 A.L.R.4th 883.) The results turn on differing state laws and the particular court's view of whether an injury was foreseeable or the result of a superseding independent act. (See, e.g., Enis v. BaCall Bldg. Corp. (7th Cir.1980) 639 F.2d 359 [causation is jury question where tenant boiled hot water on stove to compensate for lack of heat and water spilled on child]; Bennett M. Lifter, Inc. v. Varnado (Fla.Dist.Ct. App.1985) 480 So.2d 1336 [proximate cause is jury question where child collides with grandmother transporting hot water to the bathroom]; Southeast Bank v. J.A.M.A. Mobile Home Parks (Fla.Dist.Ct.App. 1986) 490 So.2d 1057 [causation sufficiently alleged where trailer park owner's negligence caused termination of electric service, leading to tenant's use of candles which started fire in which children were killed] contra, Aguirre v. Adams (1991) 15 Kan.App.2d 470, 809 P.2d 8 [landlord not liable for failure to provide hot water because no causation as matter of law where mother's negligent supervision of child resulted in burn by hot water in bathtub]; Moreno v. Balmoral Racing Club, Inc. (1991) 217 Ill. App.3d 365, 160 Ill.Dec. 303, 577 N.E.2d 179 [operating charcoal grill indoors to compensate for landlord's failure to provide heat not reasonably foreseeable and breaks causal link]; Faris v. Potomac Elec. Power Co. (D.D.C.1991) 753 F.Supp. 388 [plaintiff's act in falling asleep with candles lit is intervening cause which supersedes power company's responsibility after properly noticed termination of power]; Martinez v. Lazaroff (1979) 48 N.Y.2d 819, 424 N.Y.S.2d 126, 399 N.E.2d 1148 [father's act of transporting pot of boiling water from stove to bathroom which spilled on child was intervening act that cut off liability of landlord].)
[15] The factors listed in the Restatement include: whether the intervention brings about harm different in kind from that which would have resulted from the actor's negligence; whether the intervention is an extraordinary event; if the intervening force operates independently of the situation created by the actor's negligence; whether the intervention is caused by a third party; whether the third party's act is wrongful; and the relative degree of culpability of the third party. (Rest.2d Torts § 442, subds. (a)-(f).)
[16] Although the City hinted that Emitte might have intentionally caused the fire, the evidence was sharply disputed on this point. The only undisputed fact regarding Emitte's action was that he left a candle unattended.
[17] BAJI No. 3.79, entitled "When Third Party's Intervening Negligence Is Not A Superseding Cause," provides:

"If you find that defendant [City of Ukiah] was negligent and that such negligence was a substantial factor in bringing about an injury to the plaintiff but that the immediate cause of the injury was the negligent conduct of [Emitte Kuns], the defendant [City of Ukiah] is not relieved of liability for such injury if:
1. At the time of such conduct defendant [City of Ukiah] realized or reasonably should have realized that [Emitte Kuns] might so act; [or the risk of harm suffered was reasonably foreseeable]; or
2. A reasonable person knowing the situation existing at the time of the conduct of [Emitte Kuns] would not have regarded it as highly extraordinary that [Emitte Kuns] had so acted; or
3. The conduct of [Emitte Kuns] was not extraordinarily negligent and was a normal consequence of the situation created by defendant [City of Ukiah]. [Extraordinary means unforeseeable, unpredictable, and statistically extremely improbable.]" (BAJI No. 3.79 (8th ed.1994).)
[18] The City also argues that public policies against reducing an intentional tortfeasor's liability and finding liability when the connection between the act and the harm is too tenuous, as well as the policy against rewarding defaulting utility customers compel a finding that it not be responsible for the fire. The City ignores the fact, demonstrated by Public Utilities Code sections 10010 and 10010.1, that there is a public policy against abrupt and improper termination of utilities which competes with the policies identified by the City. If the City's action is a substantial factor in the devastating fire at issue, public policy does not shield it from liability. (See, e.g., Pub. Util.Code, § 2106 [utility is liable for all injury caused by act or omission required by law].)
[19] The doctrine of judicial estoppel applies only when: "... `(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. [Citations.]'" (International Engine Parts, Inc. v. Feddersen & Co., supra, 64 Cal.App.4th at p. 351, 75 Cal.Rptr.2d 178.)