KYOCERA CORPORATION, Plaintiff–Counter–Defendant–Appellant,

v.

PRUDENTIAL–BACHE TRADE SER-VICES, INC., formerly Prudential–Bache Trade Corporation, Prudential Capital & Investment Services, Inc., LaPine Technology Corporation, and LaPine Holding Company, Inc., Defendants–Counter–Claimants–Appel-lees.

LaPine Technology Corporation, Plaintiff–Appellee,

v.

Kyocera Corporation, Defendant–Appellant.

LaPine Technology Corporation, Plaintiff–Counter–Claim–Defendant–Appellee,

v.

Kyocera Corporation, Defendant-Counter-Claimant-Plaintiff-Appellant,

v.

Prudential–Bache Trade Services, Inc., fba Prudential–Bache Trade Corpora-tion; Prudential Capital & Invest-ment Services, Inc., Defendants–Coun-ter–Claimants–Appellees.

Nos. 01–15630, 01–15653, 01–16182, 01–16392, 01–16394 and 01–16528*.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 2002.

Filed July 23, 2002.

* Lead No. CV–87–20316–WAI.

---

James J. Brosnahan, James F. McCabe, Angela L. Padilla, and Shirley M. Hufstedler, Morrison & Foerster, LLP, for the appellant.

Charles S. Treat, Timothy P. Crudo, and Paul H. Dawes, Latham & Watkins, for the appellees.

Before: HAWKINS and SILVERMAN, Circuit Judges, and RESTANI, Judge.**

RESTANI, Judge.

Kyocera Corp. ("Kyocera"), a Japanese corporation, appeals from the March 6, 2001 Order of the United States District Court for the Northern District of California confirming an award by an Arbitration Tribunal of the International Chamber of Commerce (the "Tribunal") in favor of Prudential Bache Trade Corp. ("Prudential Trade"), LaPine Technology Corp. ("LaPine") and LaPine Holding Company on their claims that Kyocera had breached a contract to manufacture and deliver certain computer disk drives. In 1997, we reversed the district court's first order confirming the award reviewed under the Federal Arbitration Act, and remanded for a review in accordance with the higher scrutiny agreed upon by the parties. *See LaPine Tech. Corp. v. Kyocera Corp.*, 130

** Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by

F.3d 884 (9th Cir.1997) ["*LaPine I* "]. On remand, the district court confirmed the Tribunal's conclusion that (1) Kyocera's constructive notice of a proposed change regarding direct sales and Kyocera's transmission of a signature constituted an acceptance of the agreements reorganizing LaPine; (2) Kyocera's performance under the agreements was not excused; and (3) Kyocera's breaches caused LaPine's financial collapse. The district court also confirmed the Tribunal's measurement of damages. Kyocera also appeals from the district court's award of approximately $3 million in attorney fees award and prejudgment interest of approximately $1.5 million. We affirm the judgment and award of damages, attorneys' fees and interest.

**Factual and Procedural Background**

A. *Relationship of the Parties*

LaPine is a corporation formed in 1984 to design, market and sell disk drive devices. LaPine was financed by PruTech, a limited partnership, the general partner of which was an affiliate of Prudential Trade, Prudential Trade, and its Japanese subsidiary K.K.P.B. Trade Corp. ("K.K.P.B."), financed international trade ventures. Kyocera is a Japanese manufacturer of ceramic and electronic products.

In 1985, the parties entered into two contracts: a "Trading Agreement," covering sales of the product after manufacture by Kyocera, and a "Technology Transfer and Manufacturing Agreement," covering the licensing of LaPine technology to Kyocera. The parties agreed that Kyocera would manufacture the disk drives based upon LaPine's designs and technology. LaPine would order the disk drive

designation.

product from Kyocera pursuant to a revolving quantity and delivery schedule. K.K.P.B. would purchase the product from Kyocera, then resell the product at a markup to Prudential Trade which would then resell the product to LaPine on credit. Prudential Trade also agreed to provide LaPine with inventory and accounts receivable financing. Kyocera subsequently began production of the 3–1/2 inch Winchester disk drive called the "Titan–20."

## B. *LaPine's Financial Difficulties*

On January 18, 1986, LaPine, Kyocera and Prudential Trade, acting through its subsidiary K.K.P.B. entered into an agreement, under which K.K.P.B. was obligated to maintain the level of funding of LaPine until the cash flow of the latter achieved "break even" status.

In the spring of 1986, Kyocera encountered production problems, and experienced a shut-down in April and May. In June of 1986, Prudential Trade proposed via K.K.P.B. to Kyocera a reorganization of LaPine made necessary by management problems at LaPine. In July of 1986, Prudential Trade chairman Ted Fowler expressed to K.K.P.B. his decision to "structure [Prudential Trade] out of the middle." Kyocera expressed dissatisfaction that Prudential Trade had not solved the financing of the Kyocera–Prudential Trade–LaPine transaction.

By late summer of 1986, LaPine was in serious financial trouble. LaPine failed to pay K.K.P.B./Prudential Trade for a substantial quantity of disk drives delivered by Kyocera. In August, Kyocera expressed disapproval of Prudential's proposal to eliminate itself from the sales chain. On August 13, Kyocera gave written notice that it considered LaPine to be in breach for failure to make payments to K.K.P.B., preventing it from purchasing disk drives from Kyocera. Prudential proposed that LaPine be reorganized.

## C. *Reorganization*

On October 9, 1986, LaPine, Prudential Trade, K.K.P.B. and Kyocera entered into an "Agreement in Principle" for the reorganization of LaPine. The Agreement in Principle obligated the parties to negotiate the terms of a proposed "Definitive Agreement," which was required to be submitted to the respective boards of directors for final approval, and signed by November 12, 1986.

The Agreement in Principle provided for a reorganization by a means of a "merger" by which LaPine would become the wholly owned subsidiary of LaPine Holding Company, of which two-thirds of the voting stock would be owned by Prudential Trade and one-third by Kyocera. Prudential Trade and Kyocera would be obligated to make additional capital contributions and other adjustments. The Agreement in Principle also contained a binding provision for the arbitration of disputes arising under the Agreement in Principle or the Definitive Agreement.

Section 8.4 of the Definitive Agreement provides that "This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to PBTC [Prudential Trade], it being understood that all parties need not sign the same counterpart."

## D. *Pre–Closing Events*

On October 21, 1986, Kyocera's counsel drafted and circulated an "Amended Trading Agreement," under which Prudential Trade would remain the buyer of disk drives from Kyocera. On November 1, 1986, an October 31 draft of the Definitive

Agreement was circulated reflecting changes from October 25, 1986, and post-dated November 7, 1986.

On November 3, 1986, Stephanie Kogan, counsel for Prudential Trade, telephoned counsel for Kyocera to inform him that a new version of the Amended Trading Agreement would be drafted that provided for direct sales from Kyocera to LaPine, as well as a separate "Financing Agreement."

On November 4, 1986, the new draft of the Amended Trading Agreement was circulated, along with a revised draft of the Definitive Agreement and subsidiary documents except for the Financing Agreement. The new Amended Trading Agreement indicated that payment was to be made by LaPine directly to Kyocera. The parties had a meeting on November 5, 1986, at which the "direct sales" proposal was discussed. The Director of Kyocera objected to direct sales, at least without a guarantee of payment by Prudential Trade. Negotiations continued until November 7, during which time Kyocera neither further objected to nor approved the direct sales proposal.

On November 7, 1986, counsel for Prudential Trade sent a signature page of the October 31 draft of the Definitive Agreement (with a footer that read "DRAFT: 10/31/86") for the purpose of filing the reorganization with the California Department of Corporations. Mr. B. McRoy, counsel for Kyocera, sent Kyocera the signature page, requesting that it be executed, with the assurance that "[n]othing will be delivered until all the revisions had been accepted." The letter also listed revisions to the Amended Trading Agreement and Technology Agreement. Dr. K. Inamori, Chairman of Kyocera, signed the signature page.

On November 9, 1986, a new draft of the Amended Trading Agreement (dated November 8) was circulated, still including the direct sales provision. A revised Financing Agreement was drafted on November 8, 1986 but not circulated.

On November 10, 1986, counsel for Prudential Trade met with counsel for Kyocera to deliver and discuss the November 8 draft of the Financing Agreement. At this meeting, counsel also discussed minor revisions to the November 8 draft of the Amended Trading Agreement. On November 11, the revisions were incorporated into both the Amended Trading Agreement and the Financing Agreement and the agreements were sent to Kyocera's counsel (in St. Louis from Nov. 11–14) "for review."

On November 10 (11 in Japan), Mr. A. Onba, Manager of Kyocera's Corporate Development Group, faxed Kyocera's counsel Mr. McRoy a memo requesting language be inserted in the Definitive Agreement to indicate that the parties will continue to negotiate the Amended Trading Agreement and the Amended Technology Transfer and Manufacturing Agreement and that the final agreements would be signed no later than December 23, 1986.

On November 13, 1986, the parties completed the collection of the various signature pages to the proposed Definitive Agreement, including one signed by Kyocera Chairman Inamori. The next day, the Definitive Agreement (without the subsidiary agreements attached) was filed with the California Corporations Commissioner.

### E. *Final Revisions Letter*

On Friday, November 14, Ms. Kogan sent a letter enclosing selected pages from the agreements (including pages from the Amended Trading Agreement) showing revisions thereto, with the instructions that those pages be substituted in the documents previously sent. The letter further

indicated that unless comments were received on Monday, the Definitive Agreement will be "deemed delivered" on November 17, 1986. Ms. Kogan also sent eight signature pages to the Definitive Agreement to be signed by Kyocera.

Kyocera's lawyer Mr. McRoy reviewed the enclosures, marking 'OK' by each, except that Mr. McRoy made a wording change to a clause in the Amended Trading Agreement unrelated to direct sales. On November 17, 1986, rather than sign the eight signature pages sent by Ms. Kogan, Kyocera sent the original copy of the signature page signed by Chairman Inamori.

On November 21, 1986, a bound set of the Definitive Agreement (including the November 14 Amended Trading Agreement) was sent to Kyocera. Negotiations continued between the parties on November 24 and 25, 1986. At these negotiations, LaPine and Prudential Trade proposed changes to permit third parties to supply disk drives, which Kyocera rejected.

### F. Kyocera's Refusal to Execute the Amended Trading Agreement

On December 4, counsel for Kyocera had the Definitive Agreement and subsidiary agreements couriered to Kyocera's Tokyo office. Review of the Amended Trading Agreement was assigned to Kyocera's Sales Manager, who, on December 12, 1986, faxed a memo to Prudential trade stating that Kyocera could not accept the substitution of LaPine for Prudential Trade as the Purchaser. On December 17–18, Kyocera's attorney informed the other parties that Kyocera declined to sign the Amended Trading Agreement.

On December 18, Kyocera executed the eight copies of the signature page to the Definitive Agreement, and also executed all exhibits to the Definitive Agreement,

except the Amended Trading Agreement in the form proposed by Prudential Trade. On December 22, 1986, Kyocera's counsel advised the parties that Kyocera would not execute and deliver the proposed Amended Trading Agreement and the Financing Agreement. On December 26, Kyocera stated it would sign a version of the Amended Trading Agreement, provided that Prudential Trade remained the party responsible to pay Kyocera for disk drive product supplied by Kyocera to LaPine.

### G. Closing

On December 29, 1986, all documents constituting exhibits to the Definitive Agreement were executed and delivered among the parties, except the Amended Trading Agreement. LaPine and Prudential Trade declined to sign the form of Amended Trading Agreement previously circulated by Kyocera. By an "Interim Agreement" dated December 29, 1986, the parties agreed to proceed with the closing of the LaPine reorganization even though the Amended Trading Agreement had not been executed. The parties also agreed to attempt to resolve the dispute, and that Prudential Trade would pay Kyocera directly for drives supplied to LaPine until March 31, 1987.

### H. Breach

On December 29, 1986, LaPine and Prudential Trade gave notice to Kyocera of Kyocera's breach of the Definitive Agreement by reason of Kyocera's failure to execute the Amended Trading Agreement proposed by counsel for LaPine and Prudential Trade.

On January 9, 1987, Mr. K. Anjo, President of Kyocera, reported on the buy-out of LaPine at a meeting of Kyocera's Board of Directors, stating that "a new company was set up with an investment ratio of

'Prudential Bache Trade Corporation: 2' and 'Kyocera: 1' and that LaPine Technology Corporation was bought by means of the establishment of this new company."

## I. Arbitral Decision

After Kyocera refused to sell computer disk drives to LaPine despite agreeing to do so on November 14, 1986, LaPine instituted proceedings against Kyocera in federal district court claiming breach of contract. On September 2, 1987, the district court granted Kyocera's motion to compel arbitration.

The Tribunal heard the dispute and issued a final decision on August 24, 1994. Arbitration occurred in two phases:

*Phase I: Contract Formation.* The Tribunal found that Kyocera was obligated under the Definitive Agreement to execute and deliver the Amended Trading Agreement including the Financing agreement at the closing and that it refused to do so. The Tribunal reasoned that, under California law, Kyocera was deemed to have accepted Prudential's Amended Trading Agreement on the ground that (1) Kyocera had constructive knowledge of its terms by November 13, 1986, because Kyocera's lawyer knew its terms; (2) Kyocera failed to object to the proposal in writing by the November 17 deadline; and (3) Kyocera's execution of the signature page of the draft Definitive Agreement incorporating the changed Amended Trading Agreement constituted acceptance. The Tribunal stated: "Standing alone, the signing and returning of signature pages to Prudential/LaPine, without the documents to which they pertained on November 13, 1986, might have made this case harder to decide. When the events of November 14 [the "deemed delivered" letter] and November 17, 1986 are considered, however, there can be no doubt that the contract was concluded."

*Phase II: Breach/Causation/Damages.* The Tribunal found that "Kyocera's failure to execute the Amended Trading Agreement or enter into a comparable agreement by the end of the Interim Agreement period, along with Kyocera's further breaches of its contractual obligations during the Interim Agreement period, was the material and proximate cause of the damages awarded to Claimants in the Phase II Award."

## J. Motion to Vacate, Modify and Correct the Arbitral Award

Kyocera filed in the district court a Motion to Vacate, Modify and Correct the Arbitral Award claiming that: (1) The Tribunal's findings of fact were not supported by substantial evidence, (2) the Tribunal had made errors of law, and (3) there existed various statutory grounds for vacatur or modification under the Federal Arbitration Act ("FAA"). The district court held that parties could not enlarge a federal court's power by contract to modify an arbitration award on grounds in addition to those listed in the FAA. The district court reasoned that the district court only had jurisdiction to consider the grounds for vacatur listed in the FAA. The district court found no basis for vacating the Tribunal's award under the FAA and thus confirmed the award. The district court therefore denied vacatur, granted the motion to confirm, and entered judgment. The district court also awarded attorney fees and disbursements for both the pre- and post-arbitration phases of the litigation. The district court denied prejudgment interest on the attorney fees and disbursement award.

## K. Appeal to the Ninth Circuit: "LaPine I"

The Ninth Circuit reversed, holding that federal court review of an arbitration

agreement is not necessarily limited to the standards set forth in the FAA, and that the court must apply greater scrutiny, if the parties have so agreed. *See LaPine I,* 130 F.3d at 886. The Ninth Circuit based its holding on the principle that the underlying purpose of the FAA is to guarantee that courts will enforce private agreements to arbitrate and allow parties to determine the guidelines for their arbitrations. The court stated that " '[a]rbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.' " *Id.* at 888.

### L. *Remand*

On April 4, 2000, the district court entered an order denying Kyocera's Motion to Vacate and granting Prudential's and LaPine's Motion to Confirm the *Phase I* Decision. The court found that the arbitration majority did not make any errors of law in concluding that Kyocera was bound by the terms of the Definitive Agreement and of the Amended Trading Agreement, and that the conclusions were "amply supported by the undisputed facts."

On October 2, 2000, the district court entered an order confirming the *Phase II* Decision. The court "vacated" the Tribunal's Finding of Fact 135, on the ground that the accounting record showed an operating loss for 1987 at LaPine, rather than an operating profit as found by the Tribunal. The court therefore "remanded" the matter to the arbitrators "for its consideration as to the effect, if any, of the vacation of Finding of Fact 135 on its damage award." The court confirmed the remainder of the arbitrators' decision.

Although one panel member was deceased, the surviving members issued a letter dated November 22, 2000, stating that the vacatur of Finding of Fact II 135

had no effect on the damages awarded by the Tribunal, since its methodology did not require the use of an actual profit figure. On March 6, 2001, the district court denied Kyocera's Motion to Vacate and granted Prudential's and LaPine's Motion to Confirm. On March 9, 2001, the district court entered judgment in favor of Prudential and LaPine including pre-judgment interest.

### Standard of Review

■ A district court's decision to deny vacatur and to confirm an arbitration award is reviewed *de novo. See Woods v. Saturn Distribution Corp.,* 78 F.3d 424, 427 (9th Cir.), *cert. dismissed,* 518 U.S. 1051, 117 S.Ct. 30, 135 L.Ed.2d 1123 (1996). The district court's factual findings will be reversed only for clear error. *See Toyota of Berkeley v. Automobile Salesmen's Union,* 834 F.2d 751, 756 (9th Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988), *modified,* 856 F.2d 1572 (9th Cir.1988). *See also First Options v. Kaplan,* 514 U.S. 938, 947–48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("review of . . . a district court decision confirming an arbitration award on the ground that the parties agreed to submit their dispute to arbitration should proceed like review of any other district court decision finding an agreement between parties, *e.g.,* accepting findings of fact that are not 'clearly erroneous' but deciding questions of law *de novo.*").

■ Where, as here, the parties stipulate to facts which form the basis for a further inference of fact, "the factual inference to be drawn is not per se a question of law and the law controls only the reasonableness of the inference." *McKinney v. Kull,* 118 Cal.App.3d 951, 956, 173 Cal. Rptr. 696 (1981) (citation omitted). "Where the inferences are conflicting, it is for the trier of fact to resolve the conflict

in the absence of a rule of law specifying the inference to be drawn." *Id.*

## Discussion

### I. Application of Arbitration Agreement

#### A. Scope of Review

■ Kyocera claims that in reviewing the commercial arbitration award, the district court disregarded both the mandate of this Court and the parties' express agreement by employing a standard of review different from that to which the parties agreed. Kyocera claims that, we mandated the district court to apply the parties "agreed-to" standard of review, which Kyocera interprets as requiring the court to vacate the award if *any* finding of fact was found to be unsupported by substantial evidence. Because the district court found Finding of Fact 135 to be unsupported, Kyocera reasons, it erred by vacating only that particular Finding of Fact and "remanding" to the Tribunal for clarification, rather than vacating the *entire award.* Kyocera's claims lack merit.

In *LaPine I,* we agreed with the Fifth Circuit's decision in *Gateway Technologies,* which held that "[f]ederal courts can expand their review of an arbitration award beyond the FAA's grounds, when (but only to the extent that) the parties have so agreed." 130 F.3d at 889. Accordingly, the district court looked to the arbitration clause in the Definitive Agreement, and reviewed the findings of fact under a substantial evidence standard and the conclusions of law for error. The clause reads in relevant part as follows:

> The arbitrators shall issue a written award which shall state the bases of the award and include detailed findings of fact and conclusions of law. The United States District Court for the Northern District of California may enter judg-

ment upon any award, either by confirming the award or by vacating, modifying or correcting the award. The Court shall vacate, modify or correct any award: (i) based upon any of the grounds referred to in the Federal Arbitration Act, (ii) where the arbitrators' findings of fact are not supported by substantial evidence, or (iii) where the arbitrators' conclusions of law are erroneous.

Section 8.10(d) of the Definitive Agreement.

Because the Definitive Agreement provides that the court has the discretion to "vacate, *modify or correct,*" the district court was not limited to vacating the entire award. We therefore determine that the district court, upon concluding that a particular finding of fact was not supported by substantial evidence, was within its discretion to determine whether correction or modification, rather than vacatur, was appropriate.

#### B. Resubmission to Arbitration Panel for Clarification

■ Kyocera relies on *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46,* 686 F.2d 731, 733–34 (9th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633, for the proposition that resubmission is improper because an arbitration award once rendered is final. The court in *McClatchy* held that "[a]rbitrators are not and never were intended to be amenable to the 'remand' of a case for 'retrial' in the same way as a trial judge.... It is [a] fundamental common law principle that once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration." *Id.* at 734.

Kyocera omits that *McClatchy* specifically recognized limitations on the finality of an arbitration award:

It has been recognized in common law arbitration that an arbitrator can correct a mistake which is apparent on the face of his award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award. Remand to an arbitrator for clarification and interpretation is not unusual in judicial enforcement proceedings. Recommitting an issue to an arbitrator for clarification and interpretation does not effectuate an appeal to the arbitrator, a new trial, or an opportunity to relitigate the issue. None of these situations are within the policy which forbids an arbitrator to redetermine an issue which he has already decided.

*Id.* at 734 n. 1 (citations and internal quotation marks omitted). The *McClatchy* court held that none of the listed limitations applied in that case because the party seeking resubmission sought to introduce new evidence for the specific purpose of convincing the arbitrator that his decision was erroneous. *Id.* at 734 n. 1. In this case, it is clear that the district court ordered resubmission to the arbitration committee for clarification and interpretation of the award made, rather than for a reexamination of the merits, or a modification of the award. *See, e.g., Hanford Atomic Metal Trades Council v. General Electric Co.*, 353 F.2d 302, 308 (9th Cir. 1965) (resubmission proper to resolve ambiguity in applicability of award to a certain class of employees). We therefore determine that the district court did not err in seeking clarification from the Tribunal.

## II. Merits

### A. *Formation*

■ "The crucial questions of formation of an agreement ... and priority of delivery of acceptance or revocation of the agreement [are] questions of fact...." *Mabee v. Nurseryland Garden Centers, Inc.*, 84 Cal.App.3d 968, 972, 149 Cal.Rptr. 105 (1978).

### 1. *Board Approval Requirement*

■ Kyocera asserts that the Definitive Agreement never became effective as a matter of law because the Board Approval requirement in the Agreement in Principle was not met. Kyocera relies on *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 314 (9th Cir.1996), cert. denied, 519 U.S. 865, 117 S.Ct. 174, 136 L.Ed.2d 115, for the proposition that where a letter of intent to form a contract conditions contract formation on board approval, no contract is formed absent such approval regardless of other manifestations of a willingness to enter into a bargain (in that case a handshake following the signing of the letter of intent). *Rennick* rejected the plaintiff's argument that the unsigned agreement was merely a memorialization of a contract already made.

In this case, the district court found *Rennick* inapposite because the Tribunal had found that: (1) the Definitive Agreement expressly superseded the Agreement in Principle; (2) Kyocera executed the Definitive Agreement; and (3) the Definitive Agreement did not contain an express board approval requirement. These findings are supported by substantial evidence, and the inferences drawn therefrom are reasonable. First, Paragraph 8.5(a) of the Definitive Agreement specifically states: "This agreement ... constitutes the entire agreement and supersedes all prior agreements ... among the parties with respect to the subject matter hereof, including, without limitation, the Agreement in Principle, which is hereby terminated." Second, Kyocera signed the signature page to

the Definitive Agreement on November 13, 1986, and again on November 17, 1986. Third, the terms of the Definitive Agreement did not repeat the board approval requirement of the Agreement in Principle, but stated that it "shall become effective when one or more counterparts have been signed by each of the parties and delivered to [Prudential Trade]." If Kyocera wished to maintain the condition that the Definitive Agreement is effective only on board approval, it could have negotiated for such a provision while the agreement was being drafted. Kyocera does not assert that it did so. Thus, Kyocera waived the board approval requirement in the Agreement in Principle when it agreed to the superseding Definitive Agreement with terms that did not require board approval.

### 2. Silence

■ Kyocera maintains that its silence in response to Prudential's "deemed delivered" letter dated November 14, 1986, could not be reasonably understood as manifesting assent to the terms of the Definitive Agreement—in particular, the term calling for "direct sales" to LaPine—in light of its "consistent and repeated" rejections of that term. Kyocera further maintains that constructive knowledge of an offer is insufficient to turn silence into acceptance. Kyocera misreads the court's holding and the Tribunal's conclusions.

The district court did not hold, nor did the Tribunal conclude, that Kyocera's purported silence constituted acceptance, or that Kyocera's constructive knowledge of the proposed term converted its silence into acceptance. Rather, Kyocera's execution of the signature pages was held to constitute contract formation where Kyocera had constructive knowledge of the proposed term at issue and it *failed to object to that term.*[1] The Tribunal found that after the proposed term was incorporated into the November 10 draft of the Definitive Agreement, Kyocera did not communicate an objection until December 12, 1986, nearly a month after the contract was executed. On November 10 (November 11 in Japan), Mr. Onba of Kyocera did fax Kyocera's counsel Mr. McRoy directing him to continue to negotiate the Amended Trading Agreement. Nevertheless, Kyocera does not assert that McRoy actually communicated this to Prudential Trade. Chairman Jonishi, Director of Kyocera's Corporate Development Group, may have signed the Definitive Agreement on November 13 under the assumption that Mr. Onba's directive had been carried out, but this is irrelevant as his signature was retransmitted on November 17, after Kyocera had time to review the agreement.

■ The court confirmed the Tribunal's finding that Kyocera had knowledge of the new provision at the time of execution and delivery of the Definitive Agreement signature page that the current draft of the ATA contained a provision for direct sales and payment. This finding is supported by the following uncontested facts:

---

1. The district court confirmed the Tribunal majority's conclusion that Kyocera should be treated as having signed the Amended Trading Agreement with the following reasoning:
 As the result of (1) the action of Kyocera in delivering its signature page on November 13, 1986; (2) the actions of TM [lawyers for Prudential Trade], as agent for the parties, on November 14 and 17, 1986 [the "deemed delivered" letter]; (3) the action of yocera in delivering its signature page on November 17, 1986; and (4) the estoppel of Kyocera to deny it, the[Amended Trading Agreement] with its [Financing Agreement], in the form existing as of December 29, 1986 is valid as a part of the[Definitive Agreement] contract executed by Kyocera, and Kyocera was therefore obligated to sign the ATA at the closing and should now be treated as having done so.

(1) The "direct sales" change was communicated by Prudential Trade's counsel by phone on November 3 and in writing on November 4, and by Prudential Trade's Executive Vice President directly to Chairman Jonishi at a meeting on November 5, 1986.

(2) The draft Amended Trading Agreement with the new terms was actually communicated to Kyocera in Japan on November 4, 1986, several days prior to execution of the signature page by Chairman Inamori on November 7 and the delivery of this signature page to claimants' counsel on November 13.

The district court further found that the knowledge of its legal counsel is imputed to Kyocera. Imputation is proper in this instance, as communication of the proposed changes is supported by the above facts. *See Kelley v. British Commercial Ins. Co.*, 221 Cal.App.2d 554, 561–62, 34 Cal.Rptr. 564 (1963) ("Once communication is presumed or shown to have occurred, the principal is charged with knowledge of all the information acquired by the agent relative to the scope of his agency."). This is true regardless of whether Kyocera's lawyer actually relayed the information it received to Kyocera officials. *See* Restatement (Second) of Agency, § 278 (1958); *Kelley*, 221 Cal.App.2d at 562, 34 Cal.Rptr. 564 ("Where the agent is at fault in failing to communicate certain information to his principal, the latter is nevertheless affected by the knowledge of the agent). The court in *Kelley* cautioned that the knowledge acquired by [the lawyers] could not be imputed to [the principal] until the lapse of a reasonable time for its communication." *Id.* at 560–61, 34 Cal.Rptr. 564 (citations omitted). Accordingly, the *Kelley* court held that a principal is not affected by the knowledge of an agent until it is communicated to him or until the one having the knowledge has committed a fault either in transacting something for the principal or in failing to communicate it to others who are to act upon it. *Id.* In this case, the district court found that the three day period for review—from the November 10 meeting at which revisions were made to the Amended Trading Agreement, to November 13, when it delivered its signature on the Definitive Agreement—was reasonable in light of the fact that the parties were involved in "ongoing negotiations with a looming deadline." Thus, even though three days over a weekend might not be reasonable under other circumstances, the deadline known to Kyocera supports the district court's conclusion.

Kyocera relies on *Am. Bldg. Maint. Co. v. Indem. Ins. Co. of N. Am.*, 214 Cal. 608, 615–16, 7 P.2d 305 (1932), for the proposition that there can be no acceptance where the offer of modification never reached the person having authority to accept. The facts of *Am. Bldg.* are clearly distinguishable. There the failure to relay the information involved a clerk who misfiled a document, in contrast to an agent in the role of a lawyer with special duties, as in this case. Kyocera also maintains that Kyocera's lawyers lacked actual authority to enter into a contract, and relies on *Blanton v. Womancare, Inc.*, 38 Cal.3d 396, 407, 212 Cal.Rptr. 151, 696 P.2d 645 (Cal.1985), for the proposition that a lawyer lacks implied authority to enter into contracts on behalf of his client. Neither the Tribunal nor the district court found that Kyocera's lawyers had such authority, express or implied. Rather, the district court confirmed the Tribunal's finding that Kyocera's lawyers knew of the changes, and that such knowledge could be imputed to Kyocera.

Thus, neither the court nor the Tribunal found that Kyocera was "silent" in the sense that it acquiesced to contract formation. Rather, Kyocera's silence was in its

failure to state its objection to the direct sales and payment terms of the Amended Trade Agreement to any of the other parties until a month after the Definitive Agreement had been executed.

### 3. *Mistake*

 Kyocera maintains that the Tribunal's rejection of Kyocera's defense of mistake was grounded on "outdated authorities." Kyocera had argued before the Tribunal that even if the Amended Trading Agreement had been formed, it was voidable because of Kyocera's unilateral mistake as to what party was named as its buyer in the documents. The Tribunal rejected this argument on the ground that:

> Since [Kyocera] had several separate opportunities ... to make timely objections or reservations in connection with the signing and delivery of its signature and with the contract to which it represented assent, any mistake claimed on the part of [Kyocera] in signing or delivering its signature, or otherwise, was unilateral only and was unknown to the other parties and not induced by fraud or misrepresentation. It would therefore not be a ground for cancelling or disregarding the contract obligation.

Before the district court, Kyocera did not dispute the Tribunal's determination as to mistake. Nevertheless, Kyocera contends that under new California Supreme Court precedent, namely *Donovan v. RRL Corp.*, 26 Cal.4th 261, 109 Cal.Rptr.2d 807, 27 P.3d 702 (2001), and contrary to the Tribunal's conclusion, California law does not require that the mistake be known to the other party. We decline to rule on the belatedly raised issue of the propriety of the Tribunal's rejection of Kyocera's defense of unilateral mistake, as *Donovan* merely affirms pre-existing California law

regarding the court's equitable power to rescind a contract for unilateral mistake.

In *Lawrence v. Shutt*, 269 Cal.App.2d 749, 764–65, 75 Cal.Rptr. 533 (1969), relied upon by the Tribunal, the court recognized that although rescission of a contract for mistake is *usually* founded on mutual mistake or a mistake by one induced or contributed to by the other's fraud, the court "under its equitable power, does have the right to rescind a contract for the purely unilateral mistake of one contracting party not induced or contributed to by the other party." The *Lawrence* court specified, however, that:

> [It] is equally clear that in the interest of preserving some reasonable stability in commercial transactions the courts will not set aside contractual obligations, particularly where they are embodied in written contracts, merely because one of the parties claims to have been ignorant of or misunderstood the provisions of the contract. This is especially true where the contractual obligation sought to be set aside has been executed by the complainant without the exercise of reasonable care.

*Id.* (citations omitted). The *Lawrence* court declined to rescind the contract where the defendants had notice of sufficient facts regarding a disputed term but entered into the contract without making a reasonable inquiry. *Id.* The court held that such a lapse was not a mistake of fact, but rather the neglect of a legal duty. *Id.* at 765–66, 75 Cal.Rptr. 533.

 The California Supreme Court in *Donovan* clarified that California follows the Restatement (Second) of Contracts, which authorizes rescission for a unilateral mistake of fact where "the effect of the mistake is such that enforcement of the contract would be unconscionable." 109 Cal.Rptr.2d 807, 27 P.3d at 716–17 (2001), (citing Rest.2d Contracts, § 163, subd. (a)).

The *Donovan* Court expressly adopted this rule as California law on the ground that the rule in the Restatement (Second) of Contracts is consistent with its previous decisions. *Id.* Thus, the California Supreme Court in *Donovan* confirmed the validity of *existing* California law, which, as in *Lawrence,* recognized the courts' equitable power to rescind a contract for unilateral mistake under certain circumstances. Accordingly, there is no justification for Kyocera's failure to raise this issue before the district court.[2]

### 4. *Equitable Estoppel*

The Tribunal found that Prudential Trade, LaPine, and the shareholders of LaPine changed their position by committing themselves to the reorganization of LaPine, in reliance upon the existence of a complete and valid contract on or about November 17, 1986. The Tribunal found that the California Department of Corporations also relied on the existence of a complete contract. The Tribunal concluded that such findings supported a conclusion that Kyocera was equitably estopped from denying that it executed a contract

with "the essential elements, including the Amended Trading Agreement, and that it had all necessary directors' approval and other authority to do so." Kyocera argues that because the Agreement in Principle contained a board approval requirement, any "reliance" without board approval is unreasonable as a matter of law. Kyocera's argument fails because, as stated above, the board approval requirement was waived when Kyocera agreed to the Definitive Agreement.

### B. *Excuse of Performance*

Kyocera maintains that even if it were bound by the terms of the Amended Trading Agreement, Kyocera was entitled under the California Commercial Code to discontinue shipments in the spring of 1987 when Prudential Trade stopped guaranteeing payment pursuant to the interim operating procedures. Under the Code, a seller is relieved of any obligation to deliver products to a buyer when the buyer is in default, or·is insolvent, or when the seller has not been given adequate assurance of performance after written demand

---

**2.** Even if Kyocera raised the issue in a timely manner, its arguments lack merit. California Civil Code § 1577 states in relevant part:

> Mistake of fact is a mistake, not caused by neglect of legal duty on the part of the person making the mistake, and consisting in:
> (1) an unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or (2) Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed.

In this case, Kyocera cannot reasonably be considered as having made a mistake of fact. There was no inadvertent clerical error, and Kyocera did not misapprehend a term in the contract through unconscious ignorance or forgetfulness of a material fact. Rather, as in *Lawrence,* Kyocera had actual knowledge of the term at issue, as the district court found

that the legal counsel's knowledge of the contract provision is imputed to Kyocera. Even if Kyocera's actions constituted a unilateral mistake of fact, in order to obtain a rescission, Kyocera must establish, *inter alia,* that it did not bear the risk of the mistake. *See Donovan,* 109 Cal.Rptr.2d 807, 27 P.3d at 716. The defendant bears the risk of mistake when the defendant neglects a legal duty. *Id.* The district court found that Kyocera had ample time to review and understand the contract. Kyocera's failure to communicate any objection it might have had rested in apparently ineffective *internal* communications, and thus Kyocera reasonably bore the risk of that lapse. *See, e.g., Wal–Noon Corp. v. Hill,* 45 Cal.App.3d 605, 119 Cal.Rptr. 646 (1975) (failure to make reasonable inquiry to understand the meaning and content of the contract upon which one relies constitutes neglect of a legal duty).

made on reasonable grounds. *See* Cal. Com.Code §§ 2703, 2702(1), 2609.

### 1. *Default*

 The Tribunal concluded that Kyocera was required to continue fulfilling its supply obligations notwithstanding its failure to execute and deliver the Amended Trading Agreement.[3] The Tribunal conversely held that LaPine and Prudential Trade were relieved of their obligations under this Agreement, "except to the extent such obligations flowed from actions of [Kyocera] demanded by [Prudential Trade] or [LaPine], as, for instance [Prudential Trade] or [LaPine] being obligated to pay pursuant to the [Amended Trading Agreement], or as otherwise agreed, for Product properly supplied to [LaPine] by [Kyocera] pursuant to[LaPine] purchase orders."[4] Kyocera maintains that it was excused from such performance because under § 2703(a) of the California Commercial Code, "[w]here the buyer wrongfully ... fails to make a payment due on or before delivery, the seller may withhold delivery." It is undisputed that payments to Kyocera were past due.[5]

In confirming the Tribunal's Phase II award, the district court held that Kyocera was not excused from its obligation to ship further drives on account of LaPine's failure to pay for drives already received because Kyocera itself was already in default on account of its refusal to enter into the Amended Trading Agreement. *See Andrews v. Horton,* 8 Cal.App.2d 40, 44, 47 P.2d 496 (1935) ("[O]ne party cannot compel another party to perform while he is himself in default under the contract."). Kyocera does not contest the district court's findings that Kyocera breached by failing to provide written notice of its intention to terminate and to allow ninety days to remedy a payment default. Nor does Kyocera dispute the Tribunal's finding that Kyocera continuously misappropriated LaPine's technology by, for example, "placing [LaPine]—designed evaluation units in Japan and Korea in order to create the market it would need to survive in the disk drive business on its own," and otherwise attempting to sell and selling disk drives for its own account using LaPine technology. As Kyocera was itself in default, we determine that the district court did not err in finding the excuse defense under Cal. Com.Code § 2703(a) unavailable to Kyocera.

### 2. *Insolvency*

 Kyocera asserts that under Cal. Com.Code § 2702(1), the seller is relieved of any obligation to deliver products to a

---

**3.** The Tribunal relied on *Vineland Homes, Inc. v. Barish,* 138 Cal.App.2d 747, 759, 292 P.2d 941 (1956), which held that performance by a contracting party not in fault is excused by the other party's wrongful refusal to perform, but the contract is kept in force so as to protect rights of the innocent party and to enforce obligations of the delinquent party. Kyocera did not dispute the Tribunal's interpretation of *Vineland Homes* before the district court.

**4.** Thus, Kyocera's argument that the Tribunal incorrectly concluded that Kyocera waived its right to be paid is plainly false or at least misleading. Similarly, Kyocera mischarac-

terizes the Tribunal's award as "concluding that once a party breaches a sales contract, it forfeits all rights under the Commercial Code."

**5.** The district court found that: "[Kyocera] received [Prudential Trade's] last regular payment for disk drives on May 19, 1987.... At the time of the meeting on May 28, 1987, Kyocera was owed approximately $6,200,000 for drives delivered during the period March 17 to May 20, 1987, before the issuance of the [Temporary Restraining Order], of which approximately $565,000 was overdue on May 28."

buyer when the buyer is insolvent. The Tribunal had concluded that "[i]n entering into the [Definitive Agreement] and related contracts, with the knowledge it had of[LaPine's] financial condition, [Kyocera] waived such financial condition as a ground or excuse for non-performance of future orders."[6] The district court confirmed these conclusions on the ground that "[Kyocera] was aware of [LaPine's] financial condition at the outset of 1987—this financial difficulty was the prime reason for the reorganization agreements negotiated in the latter half of 1986." The district court found further support in the Tribunal's finding that LaPine would not have become insolvent had it not been for Kyocera's breaches. *See* discussion under Section C, *infra*. Kyocera asserts, however, that at the time of contract formation, it could not have known "how little credit post-reorganization LaPine would have at year end 1986 or in what dire straits La-Pine would find itself in May 1987." Kyocera's argument presupposes that LaPine collapsed as a result of a constriction of its available credit. There is no finding by the Tribunal to this effect and Kyocera does not cite any evidentiary support for this proposition. Kyocera's argument ignores the Tribunal's finding that Kyocera's constriction of supply and above—contract pricing were the substantial cause of La-Pine's "financial dire straits."

### 3. *Assurances*

■ Under Cal. Com.Code § 2609, a seller may request "adequate assurance of due performance" when he has reasonable grounds for insecurity. If assurance is not received, the seller is relieved of continuing performance. Cal. Com.Code § 2610. Kyocera asserts that under these

provisions, it was relieved of its supply obligations because it had reason to believe LaPine would be incapable of making payment. Kyocera does not address the Tribunal's finding, confirmed by the district court, that "at no material time did [Kyocera] demand from [LaPine] assurances of performance within the meaning and under the conditions of the Uniform Commercial Code." The conclusion that Kyocera waived any right to assurances of payment is supported and reasonable, especially in light of its having entered into the reorganization agreements with full knowledge of LaPine's financial condition.

### C. *Causation*

■ The district court confirmed the Tribunal's finding that Kyocera breached the Amended Trading Agreement and the Amended Technology Agreement by demanding higher than negotiated transfer prices, delaying shipping, and refusing to adhere to the quantity requirements. In determining that Kyocera's breaches were the actual cause of LaPine's financial collapse, the Tribunal made the following finding:

> The cessation of [LaPine's] business was made necessary, and the failure of [La-Pine] caused, by[Kyocera's] actions during the first half of 1987, in particular its chronic failure to produce and ship reasonable quantities of the products ordered (in part as a result of a deliberate decision by [Kyocera] not to do so), its refusal to commit to do so in the future, and also its insistence on payments in excess of the Base Prices fixed under the [Amended Trading Agreement]....

---

**6.** Kyocera incorrectly asserts that this conclusion is a "retraction" of its Phase I holding. The Tribunal in Phase I merely postponed hearing Kyocera's arguments under the Commercial Code as they related to performance, rather than contract formation under review in Phase I.

Rather than dispute these factual findings, Kyocera argues that the Tribunal's legal analysis is flawed on the ground that it failed to make an additional finding that the breaches were the *proximate* cause of LaPine's collapse. Kyocera's argument lacks merit. To establish "legal (or proximate) cause," a plaintiff must show that its injury in the ordinary course of things would likely result from the breach. *See Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1491, 1495 (9th Cir.1994). The district court correctly recognized that whether an action is likely to result in a particular outcome "in the ordinary course of things" is a question of fact. *See Kuns v. City of Ukiah*, 79 Cal.App.4th 899, 909–910, 94 Cal.Rptr.2d 359 (2000). The Tribunal found that Kyocera anticipated that its breaches would result in LaPine's collapse, citing an internal memo which reads as follows: "If [Kyocera] now stops supplying products to [LaPine] or sets a time limit in supplying products ... [LaPine] will not be able to supply the quantity that their customers demand and lose the best opportunities to capture the market. *Naturally, [LaPine] will go out of business.*" (emphasis added). Thus, the Tribunal correctly analyzed whether Kyocera's breaches would naturally result in the type of harm suffered by LaPine.

Kyocera asserts that such a determination requires a "weighing of all the other causal forces that contributed to LaPine's failure," specifically, LaPine's pre-breach credit shortage. Such a weighing of alternative causes is appropriate in determining cause-in-fact, which involves a determination that Kyocera's breaches were a "substantial factor" in bringing about its financial collapse. The Tribunal specifically determined that *but for* Kyocera's breaches, the reorganization would have succeeded and LaPine would have been profitable. Thus, the Tribunal applied the proper legal standard in determining causation.

### D. *Measure of Damages*

California Civil Code § 3300 sets the standard for determining compensation: "For the breach of an obligation arising from contract, the measure of damages ... is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." The Tribunal awarded damages for Lost Profits and Lost Value (which was based in part on the Tribunal's findings of future profitability).[7] The Tribunal also awarded reliance damages, but denied LaPine damages stemming from its misappropriation of trade secrets claim. We determine that there was an adequate basis for calculating damages based on the projected value of a start-up company.

#### 1. *Lost Value*

■ The Tribunal awarded as "Lost Value" damages the price that LaPine could have commanded if it were sold in April of 1990. The Tribunal reasoned that: (1) had Kyocera not breached its contracts, then either before or upon their termination in April 1990, it is probable that the contracts would have been renewed or LaPine would have found an alternate supplier; (2) the stock of a company with a history of earnings has inherent value so long as it is perceived to continue; (3) if LaPine sustained earnings

---

7. The Tribunal's calculation of Lost Value damages was based on an industry mean price pre-tax multiple of 11, applied to estimated 1989 earnings "in the projection that we have accepted for the determination of lost profits," increased by a premium control factor of 130%.

during the period 1987–1990, its demise would result in lost shareholder value; (4) the probability of an initial public offering ("IPO"), or a merger, or some other liquidity event during that period bears on the valuation; (5) it is not probable that La-Pine, if successful from 1987 through April 1990, would have "disappeared" from the market with the expiration of the Kyocera contracts;[8] and (6) LaPine would have been an attractive merger or acquisition candidate because of its strong revenues, good profitability, market position, and customer base.[9]

Kyocera argues that the Lost Value award was determined as of a "legally irrelevant" date, the proper measure being LaPine's value in late 1986 or early 1987, the date of the breach. However, the Definitive Agreement expired in April 1990, and thus we conclude that the Tribunal did not err in using that date to calculate what damages flowed from the breach of the contract under California Civil Code § 3300. There is no support for the proposition that in all destruction-of-business cases, value must be determined from the time of breach. The authorities cited by Kyocera do not establish such a general rule. *See, e.g., Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 221 Cal.Rptr. 171 (1985) (value determined from time of breach where plaintiff offered no evidence as to how future profits would be generated). Accordingly, we agree with the district court that the Tribunal

did not commit a legal error when it used the April 1990 date to calculate damages.

### 2. Contractual Limitations on Lost Value Damages

Kyocera generally argues that LaPine's damages should be limited to what it could have reasonably expected to receive from full performance on the contract. Specifically, Kyocera relies on the following aspects of the contract: (a) the manufacture of drives within a certain range of memory; and (b) the ninety day limitation on liability stemming from a price disagreement.

### a. Future Products

■ Kyocera argues that the contract contemplated only the manufacture of 20 and 30 MB drives, and it had not yet agreed to manufacture 40 MB drives. Kyocera claims that since it was not required to manufacture any particular product designed or developed by LaPine, it cannot be held liable for any losses associated with the 40 MB drive. The district court held that Kyocera's willingness to manufacture the 40 MB drive is irrelevant to the measure of damages because the Tribunal determined that Kyocera's breaches "effectively destroyed what was a promising enterprise and prevented it from transitioning to a new manufacturer for products which were shown by the evidence to have been well-designed and highly desired in the market." Thus, it is

---

8. The Tribunal reasoned that "[I]f an IPO occurred in early 1990, for example, [La-Pine's] shareholders would have pocketed the cashout; if it had not, they would probably have entered May 1990 still owning valuable stock in a profitable and thriving company."

9. In assessing this probability, the Tribunal found that stock market conditions during 1988–1990 were good and many companies like LaPine went public. The Tribunal concluded that "given LaPine's projected level of

earnings in the applicable time period, there was an extremely good market window for an IPO in the period March 1988 May 1990." The Tribunal specified that the existence of LaPine's value as a going concern was not dependent on the occurrence of a liquidity event during 1987–1990, as "[a] profitable [LaPine] would have had value to its shareholders ... whether or not that value was liquidated and realized in a particular transaction."

irrelevant that Kyocera could have declined to manufacture the 40 MB drive, as the Tribunal found that its actions prevented LaPine from having its design for the 40 MB drive, made by Kyocera or any other manufacturer.

### b. *Ninety–Day Limitation*

■■■ Kyocera claims that the contractually—provided ninety-day period following a "price disagreement" limited its liability for existing products, the 20 and 30 MB drives, to only those profits that would have been realized during that period. The Tribunal found that rather than allowing for bargaining as to price, the Amended Trading Agreement fixed transfer prices according to Market Price, and thus contemplated disagreements as to how to determine Market Price. The Tribunal further found that Kyocera did not comply with the contractual procedure for objecting to Market Price. As Kyocera does not dispute either finding, we determine that the ninety-day period provision is not a proper ground for limiting damages.

### 3. *Cover*

■■■ Kyocera contends that LaPine's 1987 admission before the district court that it needed only 30,000 drives per month precludes recovery of consequential damages such as "lost value." Specifically, Kyocera contends that under California Commercial Code § 2715(2)(a), LaPine's failure to cover its losses by finding an alternative supplier during the ninety day period relieves Kyocera of liability beyond that period. The district court confirmed the Tribunal's finding that LaPine was prevented from covering "by Kyocera's refusal to provide the 'bridge' supply that it was obligated to." The Tribunal had described the dispute regarding how many units per month would be necessary to bridge production to another supplier as follows: (1) LaPine indicated to Kyocera that it needed 45,000 units per month for six to nine months in order to bridge production, and that Kyocera's own capacity study showed that it could manufacture 40,000 units per month; and (2) Kyocera responded that it did not want to make more than 30,000 units per month because of profitability problems, and that it was in a dissolution mode and would not be producing disk drives in the future.

Kyocera asserts that the district court erred because cover was in fact available but not taken. Kyocera bases its assertion on the fact that the court granted LaPine a temporary restraining order ("TRO") in which it ordered Kyocera to supply 30,000 drives per month to LaPine, but LaPine refused them because it lacked financing to pay for them. The Tribunal had found, however, that the purpose of seeking the TRO was "to persuade [Kyocera] to recognize and perform its contractual obligations." As Kyocera is essentially asking the Court to make an independent determination as to whether the court-ordered supply would in fact be sufficient "cover" to sustain LaPine until a new manufacturer could be brought to operating capacity, the Court declines to do so. This is a factual matter subject to limited review, and Kyocera offers no valid ground for questioning the reasonableness of the inference drawn from factual findings regarding the possibility of cover.

### 4. *Whether Damages were "Speculative"*

■■■ Kyocera maintains that the awarded damages were inherently speculative on the grounds that: (1) LaPine had consistent net losses both before and after the reorganization, and profit projections exceeded LaPine's actual results as well as its own financial projections; (2) its definition of the relevant product market as

limited to 3–1/2 inch disk drives is inconsistent with its finding that 3–1/2 inch and 5–1/4 inch disk drives compete; and (3) the surrogate companies used by the Tribunal were in fact dissimilar because they manufactured their own disk drives and had different cost structures.

"Evidence to establish [lost] profits must not be uncertain or speculative." *Cont'l Car–Na–Var Corp. v. Moseley,* 24 Cal.2d 104, 113, 148 P.2d 9 (1944). "This rule does not apply to uncertainty as to the *amount* of the profits which would have been derived, but to uncertainty or speculation as to whether the loss of profits was the *result* of the [breach] and whether any such profits would have been derived at all." *Id.* (citation omitted, emphasis added). Thus, the inquiry is limited to whether there is substantial support for the Tribunal's determination that, but for Kyocera's breach, LaPine would have earned profits in the future, and whether the determination as a whole is reasonable.

First, the fact that LaPine did not have net profits before 1987 does not necessarily bar it from recovering for lost future profitability, in light of the following Tribunal findings: (a) that in 1987 the industry standard shifted from the 5–1/4 inch drive to the 3–1/2 inch drive, thereby creating a market in which LaPine was an early entrant; (b) that LaPine developed the 40 MB drive before its competitors; and (c) LaPine would have been able to design and obtain 40 MB drives had it not been destroyed, as its engineering staff was capable of the designs and a substitute manufacturer could have been secured.[10]

Second, the Tribunal's definition of the relevant market is not inconsistent with its description of competition. In determining that the 3–1/2 inch drive market was the relevant market for measuring LaPine's market share, the Tribunal recognized that "[a]t the beginning of the contract period, especially, there was some direct competition between the 3–1/2 inch form factor and the 5–1/4 inch form factor, because 3–1/2 inch drives could be used in 5–1/4 inch slots (although not vice versa)." Nevertheless, the Tribunal reasoned that "[t]he market reality ... was that the 3–1/2 inch form factor was rapidly displacing the 5–1/4 inch form factor." Thus, the Tribunal's finding of market displacement supports its ultimate conclusion that the 3–1/2 inch drive was the relevant market, and that LaPine had a market share of 11.4% therein (based on actual net shipments in the first quarter of 1987).

Third, the Tribunal also applied industry pricing trends to sales volume that could have been secured to determine the amount of likely revenue. From this amount, the Tribunal deducted costs as measured by the costs of comparable companies in the industry. Contrary to Kyocera's contention, the Tribunal specifically accounted for the differing cost structures of the surrogate companies, concluding that if anything, LaPine's costs would have been *lower* given the nature of the disk drive industry and the advantage of having a fixed transfer cost arrangement.[11] The

---

**10.** There is no support for Kyocera's proposition that an expert's projection of future profits is necessarily limited by the company's internal profit projections.

**11.** The Tribunal found that:

The assumption that [LaPine's Cost of Goods Sold (COGS)] would have been in line with the average experience in the industry is reasonable, in the absence of persuasive evidence suggesting that [LaPine's] costs would have been higher. There is reason to project that [LaPine's] COGS would have been *lower* than the industry average because of its contractual arrangement with [Kyocera].... [LaPine] had the advantage of an outside supply contract in which its transfer cost was arithmetically

Tribunal also accounted for differences in average pricing from that of the surrogate companies. The Tribunal specifically found that prices do not decline as rapidly for sellers with an OEM (Overseas Equipment Manufacturer) arrangement, but concluded that this price difference evens out over time, as the new seller builds its OEM business and its portfolio of old contracts. Kyocera does not dispute these findings of fact.

Accordingly, we determine that the evidence supporting the Tribunal's award of lost profits is neither uncertain nor speculative, but rather is substantial.

## 5. Reliance Damages

The Tribunal found that Prudential Trade was entitled to reliance damages based on Prudential Trade's restructuring of LaPine's long-term debt[12] and extending of a line of credit[13] to LaPine pursuant to the Definitive Agreement. The Tribunal found that Prudential Trade was rely-

ing on Kyocera not to default in its performance of its contractual obligations.[14]

### a. Board Approval

Kyocera first maintains that Prudential Trade's reliance on the formation of the Amended Trading Agreement was unreasonable as a matter of law because the Agreement in Principle conditioned contract formation on board approval. Kyocera's arguments on this ground lack merit for the reasons stated above regarding the inapplicability of the Board Approval requirement.

### b. Time Period

Kyocera asserts that during the only four weeks in which reliance might have been reasonable,[15] Prudential Trade advanced none of the sums that were awarded by the Tribunal. Kyocera contends that the principal amount of the note was advanced to LaPine as trade debt before August 1986, and trade line restructuring took place in late December, after

---

fixed as a percentage of its estimated selling price in the marketplace. This placed on [Kyocera] the risk that its manufacturing costs would rise as a percentage of estimated market sales price, as a result of market price erosion, [Kyocera's] own manufacturing cost inefficiency, or fluctuation of the yen-dollar exchange rate. Nearly all [of] [LaPine's] competitors, by contrast, did their own manufacturing, and therefore directly bore the risk that prices would decline faster than manufacturing costs.

12. The Tribunal reasoned as follows: (1) Prudential Trade agreed to restructure $15 million of LaPine's indebtedness, half of which was restructured as long-term debt, with set terms for payment and interest; (2) LaPine's balance sheet at the end of 1986 showed assets of $8,963,000 and Prudential Trust would have had first call on those assets; (3) Prudential Trade was making a real investment by restructuring $7.5 million in pre-reorganization debt; (4) since no payments were ever made on this debt, Prudential

Trade's damages include $7.5 million in principal and $2 million in unpaid interest (at the contract rate) as of April 30, 1990.

13. The Tribunal found that "[a]s of April 30, 1990, Prudential Trade's lost investment damages on the trade line were $3,235,146 in unpaid principal and $1,191,241 in unpaid interest."

14. See ER1749: "... [Prudential Trade, LaPine] and the shareholders of [LaPine] all changed their positions, at least some to their detriment, by committing themselves to the reorganization of [LaPine], in reliance upon the existence of a complete and valid contract ...." (emphasis omitted).

15. Specifically, Kyocera contends that Prudential Trade's reliance on Kyocera's intent to be bound to the Amended Trading Agreement would only be reasonable between November 17 (the "deemed delivered" date) and December 12 (when Kyocera objected to Prudential Trade's Amended Trading Agreement).

Kyocera voiced its objections to Prudential Trade's Amended Trading Agreement. There is nothing in the record to support Kyocera's proposed limitation of the period of reliance. Prudential Trade's reliance on the eventual completion of the contract is reasonable considering the ongoing negotiations taking place prior to the distribution of the draft Amended Trading Agreement. That Kyocera voiced an objection to a payment arrangement does not necessarily render Prudential Trade's reliance on the contracts as a whole unreasonable, as Kyocera was bound to the Definitive Agreement and, under the Interim Agreement, the parties were under an obligation to continue negotiating in good faith.

### c. *Alleged Inconsistency*

Lastly, Kyocera argues that the reliance damages award is inconsistent with the lost value award. Kyocera's reasoning seems to be that in calculating lost value damages, the Tribunal assumed LaPine would have been successful and could have paid its debts to Prudential, yet the reliance damages are based on the assumption that LaPine would not have paid Prudential. Kyocera's argument has no merit. The lost value damages were an approximation of how much LaPine would be worth had Kyocera not breached. In contrast, reliance damages were awarded according to amounts Prudential was *actually* unable to recoup from its investment in LaPine on account of Kyocera's breach. Reliance damages were *not* based on an assumption that LaPine would have been unable to pay Prudential had Kyocera performed.

### E. Offset

■ Kyocera argues that the district court erred in refusing to correct the Tribunal's award to reflect the fact that Prudential and LaPine were jointly and severally liable to Kyocera on its counterclaim for $10.6 million. We determine that Kyocera has waived this issue.

In Kyocera's October 27, 1998 motion to vacate, modify and correct the arbitral award, Kyocera indicated in its introductory statement of the issues that it was moving, *inter alia*, "to correct ... the [arbitral] award in its favor of $10.6 million for payments due Kyocera for disk drives manufactured and shipped as to which Prudential Bache and LaPine defaulted in May, June and July 1987, plus interest." Kyocera stated that "[w]hile the arbitrators found Prudential Bache and LaPine to be 'jointly and severally' liable for this amount, the award itself confines payment only by the now—insolvent LaPine." In its brief, however, Kyocera presented no argument or authorities in support of its motion to correct on this ground.

On March 6, 2001, the district court denied Kyocera's motion to correct the award, reasoning that "the transcript of the hearing ... does not reveal an unqualified and unequivocal stipulation that such a correction is proper. In the court's opinion it is not proper and, in the absence of a stipulation, the court has no authority to make an award not made by the Tribunal." Accordingly, on May 17, 2001, the district court ordered that LaPine recover from Kyocera a certain amount that had been offset by the amount owing to Kyocera.[16]

---

**16.** The district court ordered that "LaPine ... recover of Kyocera ... the sum of $370,571,719.00, which amount is a setoff of $10,690,313.00 ... to Kyocera against LaPine ..., and which is calculated as of March 30, 2001, with prejudgment interest accruing

thereafter at the rate of $61,180.00 per day until the Court's entry of judgment on May 2, 2001 ...." The district court also ordered that after entry of the judgment, LaPine was entitled to post-judgment interest accruing at

The district court did not allow for a setoff by Kyocera against Prudential.[17] Thus, while the Tribunal found Prudential and LaPine to be jointly and severally liable for the amount owed Kyocera, the district court confirmed an award contemplating payment only by LaPine.

■ On the first appeal, Kyocera claimed that there existed various statutory grounds for vacatur or modification under the FAA, but sought to preserve the right to attack the court's decision on those grounds without presenting any argument or authorities with respect to such grounds. *See LaPine Tech. Corp.*, 130 F.3d at 887 n. 2. In view of such failure, we did not allow Kyocera to preserve its argument for correction and affirmed the district court's resolution thereof. *Id.* (citations omitted). An issue not discussed in a brief, although mentioned in the Statement of Issues, is deemed to be waived. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir.1986) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief . . . .") (citation omitted).

We are bound by our previous ruling that Kyocera has waived its right to contest the issues based on these grounds, including whether the district court's award should be corrected under the FAA to reflect that LaPine and Prudential were held to be jointly and severally liable to Kyocera on its counterclaim. Having once waived the issue, Kyocera cannot resurrect it now.

**F. Attorney Fees**

On May 10, 2001, following the district court's entry of judgment, Prudential Trade and LaPine filed a Motion to Recover Attorney's Fees and Disbursements. Prudential Trade and LaPine sought $262,535.69 in fees and costs for pre-arbitration district court proceedings (plus prejudgment interest), and $2,731,954.71 in fees and costs for post-award activity in the district court and in this Court (again, plus prejudgment interest). The court granted the motion on June 21, awarding Prudential and LaPine $3,004,266.26 in attorneys' fees plus pre-judgment interest under California Civil Code § 3287(a). The amounts claimed were incurred in connection with proceedings in the federal courts both before and after the underlying arbitration was conducted. On July 5, 2001 Kyocera appealed the court's order.

■ Absent statute or enforceable contract, litigants pay their own attorneys' fees. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). In reviewing an arbitration award, a district court may award attorney fees on the contract at issue and under § 1717(a) of the California Civil Code.[18]

---

the statutory rate based upon entry of judgment on May 2, 2001.

**17.** The district court ordered that "Prudential . . . recover of . . . Kyocera . . . the sum of $33,093,961, which is calculated as of March 30, 2001, with prejudgment interest accruing thereafter at the rate of $5,463.00 per day until the court's entry of judgement on May 2, 2001." The district court also ordered that after entry of the judgment, Prudential was

entitled to post-judgment interest accruing at the statutory rate based upon entry of judgment on May 2, 2001.

**18.** California Civil Code § 1717(a) provides:

In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce [the provisions] of that contract, shall be awarded either to one of the parties or to the [prevailing] party . . ., then the

See, e.g., *Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334 (9th Cir.1986).

The Amended Trading Agreement and the Amended Technology Agreement provide that "the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs (not limited to taxable costs)." Kyocera asserts that Prudential Trade and LaPine resisted Kyocera's motion to compel arbitration on the ground that the dispute arose under the Amended Trading Agreement and the Amended Technology Agreement, rather than the Definitive Agreement. Kyocera asserts that the district court "rejected that argument and granted Kyocera's motion to compel arbitration under the Definitive Agreement," which contains no attorney fees provision. Thus, Kyocera concludes that Prudential Trade and LaPine lack a contractual basis for awarding attorney fees.

First, Kyocera's statements are misleading, as the district court granted its motion to compel arbitration, but did *not* state the grounds upon which he granted the motion. The district court apparently compelled arbitration based on Section 8.10 of the Definitive Agreement (as the subsidiary agreements do not reference the arbitration clause of the Definitive Agreement), but there is absolutely no indication that the district court "rejected" the contention that the dispute itself arose out of the subsidiary agreements.[19]

█ Second, Kyocera's argument is illogical, as the arbitration provision of the Definitive Agreement cannot be read as overriding the fees provisions of the Amended Trading Agreement and the Amended Technology Agreement. Indeed, because the Amended Trading Agreement and the Amended Technology Agreement were central to the parties' controversy and subsidiary to the Definitive Agreement, their provisions allowing for attorney fees are incorporated into "the contract" which forms the basis for recovery under section 1717(a).

█ Kyocera maintains that any award of fees or costs over the amount already awarded by the Tribunal would be inconsistent with federal arbitration policy. We determine that this argument lacks merit. The Definitive Agreement arbitration clause broadly provides that *all questions, disputes or differences* arising out of the agreement shall be settled by arbitration. Nevertheless, the specific attorney fees provision in the Amended Trading Agreement does not limit recovery of attorney fees to arbitration proceedings: "[i]f any legal action, arbitration or other proceeding is brought for the enforcement of this Agreement ... the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs ... incurred in that action, arbitration or proceeding ...." The Tribunal, however, did *not* determine that attorney fees were unavailable, so the district court cannot be said to be impinging on the arbitrators' decision. That the Tribunal may have had the *power* to award attorney fees does not

---

party who is determined to be the [prevailing] party ..., whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to ... costs [and necessary disbursements].

**19.** The relevant clause reads as follows: 8.10. *Arbitration.* (a) Subject Matter. All questions, disputes or differences in any way arising out of or relating to [1] this Agreement, [2] any agreement contemplated hereby to the extent such agreement references this section 8.10, or [3] the Agreement in Principle, or [4] the transactions contemplated herein or therein .... shall be settled by arbitration.

necessarily preclude the district court from exercising its power to do so.

## G. Interest

 A district court's calculation of pre-judgment and post-judgment interest is reviewed for abuse of discretion. *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994). The district court determined that pre-judgment interest should apply on the award amount up to April 26, 2001 (entry of the second judgment), and post-judgment interest should apply thereafter. The district court further specified that "[a]fter entry of the judgment, post-judgment interest will accrue at the statutory rate as determined pursuant to 28 U.S.C. section 1961 based upon entry of judgment on May 2, 2001." The district court issued a Memorandum of Decision on Applicable Interest Rates affirming its pre- and post-judgment interest calculation, and concluding that "no enforceable judgment has yet existed in this case until entry this date, April 26, 2001, because the judgment of January 5, 1996, was *reversed* by the Court of Appeals."

Kyocera contends that post-judgment interest accrues as of the date of an *initial* judgment where a second judgment does not substantially alter a previously entered judgment, or where it would be inequitable to allow one of the parties to benefit from the later judgment date. Kyocera argues that because damages were initially ascertained as of the entry of the initial judgment (January 5, 1996), the statutory post-judgment rate should apply as of that date "because the delay in reviewing the merits of Kyocera's arguments was caused by Prudential's and LaPine's insistence that the district court lacked jurisdiction to consider the merits of the awards."

 Where a vacated judgment is restored after further proceedings, the pre-judgment interest "runs through the date of the newly-entered judgment." *AT & T v. United Computer Sys.*, 98 F.3d 1206, 1209 (9th Cir.1996) (citation omitted). "An exception to this rule is made when a legally sufficient determination of damages had been made at the time of some prior judgment, which the judgment upon remand essentially reinstates." *Id.* (citation omitted). Thus, the question becomes whether the initial judgment was "legally sufficient," and damages "ascertained" therein. Given the Ninth Circuit's instruction to conduct a heightened review of the case on remand, the initial judgment confirming the Tribunal's damage award may not be considered "legally sufficient." Although the subsequent judgment did not alter the initial damage award, it did not merely "reinstate" the initial judgment. Furthermore, the equities do not necessarily weigh in Kyocera's favor, since at the time of the appeal of the initial judgment, it was an open question whether the district court was bound by the standards of review provided for in the FAA, and Prudential Trade/LaPine did not "mislead" the Court regarding the scope of review. Therefore, we determine that the district court did not err in calculating interest based on the entry of the subsequent judgment.

## Conclusion

Accordingly, the district court's judgment and award are AFFIRMED.